GREENWOOD, Appellant,

v.

TAFT, STETTINIUS & HOLLISTER, Appellee.

[Cite as *Greenwood v. Taft, Stettinius & Hollister* (1995), 105 Ohio App.3d 295.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–940066.

Decided Sept. 13, 1995.

*Laufman, Rauh & Gerhardstein, Alphonse A. Gerhardstein* and *Robert F. Laufman,* for appellant.

*Katz, Teller, Brant & Hild* and *Robert A. Pitcairn, Jr.,* for appellee.

MARIANNA BROWN BETTMAN, Presiding Judge.

Plaintiff-appellant Scott Greenwood, an attorney, filed a lawsuit in which he alleges that he was fired from the law firm of defendant-appellee, Taft, Stettinius & Hollister ("the Taft Firm"), because he is a gay male and because of his pro bono work in favor of retaining the Human Rights Ordinance of the city of Cincinnati. Greenwood alleges that his discharge for these reasons was a violation of public policy. He also alleges that private information about his male partner was disseminated in violation of his right to privacy. In response to

Greenwood's complaint, the Taft Firm filed a motion to dismiss for failure to state a claim pursuant to Civ.R. 12(B)(6), which was granted by the trial court. In this appeal, Greenwood argues that he has stated claims for relief for wrongful discharge and for invasion of privacy, and that the trial court erred in granting the Taft Firm's Civ.R. 12(B)(6) motion.

A Civ.R. 12(B)(6) motion tests the sufficiency of the complaint, and the trial court, in ruling on such a motion, must take all allegations in the complaint as true. All reasonable inferences must be drawn in favor of the nonmoving party. *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182; *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 532 N.E.2d 753. A court may dismiss a complaint on a Civ.R. 12(B)(6) motion only when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *O'Brien v. Univ. Community Tenants Union, Inc.* (1975), 42 Ohio St.2d 242, 71 O.O.2d 223, 327 N.E.2d 753.

With these hornbook principles in mind we turn to Greenwood's assignments of error. We will first consider his second assignment of error in which he alleges that the trial court erred in failing to allow him to prove that his discharge was in violation of public policy.

Both sides to this dispute are in agreement that the general rule in this state is that private employment is at will, meaning that an employee may be fired at any time for any reason or no reason. Present-day exceptions to the employment-at-will doctrine have emerged at both state and federal levels. Following the landmark federal civil rights legislation of the 1960s, Ohio enacted its own state civil rights laws, codified in R.C. Chapter 4112. Though it has been through several amendments, R.C. 4112.02 has, since 1976, made unlawful discrimination against a person with respect to terms and conditions of employment because of race, color, religion, sex, national origin, handicap, age or ancestry. Both public and private employers are covered by this statute.

Other than the statutory protections contained in the state civil rights laws, employment at will was still the general rule in Ohio until 1985, when the Ohio Supreme Court, in the landmark decision of *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150, signaled its willingness to create exceptions to the at-will doctrine, specifically applying the doctrine of promissory estoppel to oral at-will employment agreements. *Id.* at paragraph three of the syllabus. Nevertheless, the court reaffirmed the general rule of employment at will, stating:

"Unless otherwise agreed, either party to an oral employment-at-will agreement may terminate the employment relationship for any reason *which is not contrary to law.*" (Emphasis added.) *Id.* at paragraph one of the syllabus.

After *Mers*, courts carved out other exceptions to the employment-at-will doctrine, most particularly in areas of promissory estoppel. See *Weiper v. W.A. Hill & Assoc.* (1995), 104 Ohio App.3d 250, 661 N.E.2d 796. Further, in 1988, the legislature gave whistleblowers protection from retaliatory discharge by enacting R.C. 4113.52.

The Ohio Supreme Court also began to move toward protection for workers fired for reasons which violated public policy. In 1990, the court decided *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, in which it held that "public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." *Id.* at paragraph one of the syllabus. In 1992, the court decided *Tulloh v. Goodyear Atomic Corp.* (1992), 62 Ohio St.3d 541, 584 N.E.2d 729, in which it reiterated that in the absence of statutory authority, no common-law basis in tort for a wrongful-discharge claim exists.

However, in 1994, in a dramatic change of position, and in a decision of potentially far-reaching ramifications, the court overruled *Tulloh* and held:

" 'Clear public policy' sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law." *Painter v. Graley* (1994), 70 Ohio St.3d 377, 639 N.E.2d 51, paragraph three of the syllabus.

In analyzing Greenwood's claim of wrongful discharge, we will first look at those statutory enactments by the General Assembly which could have a bearing on this issue. We will then consider Greenwood's argument that he can rely on a local municipal ordinance to support a public policy exception. Finally, we will look for public policy on this issue beyond statutory enactments. In this analysis, we will compare the approach of other states where helpful.

Several states and the District of Columbia have chosen to enact legislation prohibiting discrimination against homosexuals in employment by including sexual orientation as a protected status in their civil rights laws.[1] In contrast, the

---

1. Conn.Gen.Stat. 46a–81(c); D.C.Code 1–2501; Haw.Rev.Stat. 368–1 and 378–2; 5 Me.Rev. Stat. 4684–A; 151B Mass.Gen.Laws 3; Minn.Stat. 363.03; N.J.Stat.Ann. 10:5–4; 3 Vt.Stat. Ann. 961; Wis.Stat.Ann. 111.36. See, also, R.I. H.B. 6678, signed by the governor May 22, 1995.

In addition to the protections provided on the basis of sexual orientation, the legislatures of some of these states have also included policy statements that their civil rights statutes should not be considered an endorsement or approval of homosexuality or bisexuality (Massachusetts); should not be read to require the teaching of homosexuality or bisexuality as an acceptable lifestyle (Connecticut); should not be read as legitimizing marriages between same-

Ohio civil rights statutes, R.C. Chapter 4112, do not include sexual orientation among their protections. In fact, while R.C. 4112.02 prohibits discrimination based on "handicap," that term is defined specifically to exclude homosexuality, bisexuality, and other sexual disorders or dysfunctions. R.C. 4112.01(A)(13) and (16)(b). Further, while at least sixteen states with hate crime legislation include a penalty enhancement for crimes motivated by sexual orientation, the Ohio ethnic intimidation statute, R.C. 2927.12, has no such provision.

On the other hand, on December 30, 1983, then Governor Richard Celeste, in a sweeping statement of public policy, issued Executive Order 83–64, which made it unlawful for any agency, department, board or commission within the executive branch of the state government to discriminate in state employment against any individual based on that individual's sexual orientation. However, this order, if it is still in effect, would not apply to Greenwood; instead R.C. 4112.02 applies and it affords him no protection.

On November 25, 1992, the city of Cincinnati enacted an ordinance known as the Human Rights Ordinance which prohibited "unlawful discriminatory practices in the City of Cincinnati based on race, gender, age, color, religion, disability status, sexual orientation, marital status or ethnic, national or Appalachian regional origin, in employment, housing, and public accommodations by ordaining Chapter 914, Cincinnati Municipal Code."

Sexual orientation is clearly a protected status under this ordinance, which applies in both public and private arenas.

Greenwood relies on the Human Rights Ordinance as the public policy which made his discharge wrongful under either *Greeley* or *Painter.* He argues that public policy need not be of uniform statewide application but can be ascertained from a municipal ordinance. The problem with this proposition may best be illustrated by what happened to this ordinance.

The Human Rights Ordinance was challenged at the next general election after its passage by a ballot initiative known as "Issue 3," in which a self-executing charter amendment was proposed which would make it unlawful for the city and its various boards and commissions ever to enact any form of protected status based on sexual orientation. This tempestuous and ugly chapter of the city's history is still ongoing. Issue 3 was passed by sixty-two percent of the vote and became Amendment XII to the city charter. Upon the filing of a lawsuit by the

sex couples (Massachusetts, Vermont, California); do not establish sexual orientation as a separate cultural classification in society (Connecticut); do not require affirmative action on that basis (California, Connecticut and New Jersey). Norris & Randon, Sexual Orientation and the Workplace: Recent Developments in Discrimination and Harassment Law (1993), 9 Emp.Rel.L.J. 33.

principal opponents of Issue 3, a federal district court temporarily enjoined the enforcement of the amendment, and then found it to be unconstitutional. The United States Court of Appeals for the Sixth Circuit reversed the trial court's decision in *Equality Found. of Greater Cincinnati v. Cincinnati* (C.A.6, 1995), 54 F.3d 261.[2] Meanwhile, on March 8, 1995, the city council, by a vote of five to four, removed the sexual orientation clause from the Human Rights Ordinance.[3]

■ Greenwood cites no real authority for the proposition that public policy can be determined from a single municipal ordinance. His analogy to differing municipal traffic laws is unpersuasive. On this point we agree with the Taft Firm that public policy which warrants an exception to the employment-at-will doctrine *must* be of uniform, statewide application; it cannot be fragmentary, as with a single municipal ordinance. This conclusion is supported by the Supreme Court's recent analysis in *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 652 N.E.2d 653.

Greenwood also alleges he was fired for his pro bono work in favor of the Human Rights Ordinance and in opposition to Issue 3, in other words, for his participation in the political process and for his choice of causes. We will examine this claim independently to see if it violates public policy, either statutory or otherwise.

Unlike those states which have given protected status to sexual orientation in their civil rights statutes, California has afforded protection to gays and lesbians in a different way. Rather than including sexual orientation as a civil right in its Fair Employment and Housing Act, sexual orientation is protected as a form of political activity.[4]

Cal.Labor Code 1101 states:

"No employer shall make, adopt, or enforce any rule, regulation, or policy:

"(a) Forbidding or preventing employees from engaging or participating in politics or from becoming candidates for public office.

"(b) Controlling or directing, or tending to control or direct the political activities or affiliations of employees."

---

**2.** A petition for certiorari to the United States Supreme Court was filed on August 10, 1995.

**3.** At oral argument, counsel for Greenwood conceded that because of the repeal of the Human Rights Ordinance his remedies would be limited to the time from its enactment to its repeal.

**4.** Note, Reorienting the Workplace: Examining California's New Labor Code Section 1102.1 and Other Legal Protections Against Employment Discrimination based on Sexual Orientation (1993), 66 S.Cal.L.Rev. 2297, is an excellent law review article on this subject which I would like to acknowledge for the analysis of California law in this opinion. It criticizes the approach taken by California and recommends that sexual orientation be added by amendment to the Fair Employment and Housing Act.

Cal.Labor Code 1102 states:

"No employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or refrain from adopting or following any particular course or line of political action or activity."

In 1979, in a landmark decision, the California Supreme Court held that these code sections "serve to protect the 'fundamental right of employees in general to engage in political activity without interference from employers.'" *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979), 24 Cal.3d 458, 487, 156 Cal.Rptr. 14, 32, 595 P.2d 592, 610. The court went on to hold that these statutes could not be read as limited to partisan activity. *Id.* at 487, 156 Cal.Rptr. at 32, 595 P.2d at 610. "[T]his ruling led to the conclusion that employees who were struggling for gay and lesbian equal rights were protected because their actions constituted 'political activity' under the Labor Code." Note, Reorienting the Workplace: Examining California's New Labor Code Section 1102.1 and Other Legal Protections Against Employment Discrimination Based on Sexual Orientation (1993), 66 S.Cal.L.Rev. 2297, 2301. Accord *Smedley v. Capps, Staples, Ward, Hastings & Dodson* (N.D.Cal.1993), 820 F.Supp. 1227, 1229 ("Against a background of cases defining political activity in broad terms, the California Supreme Court concluded that the fight against discrimination on the basis of sexual preference was political in nature."). Subsequently, Sections 1101 and 1102 of the Labor Code were amended to include Section 1102.1. It states that "[s]ections 1101 and 1102 prohibit discrimination or different treatment in any aspect of employment or opportunity for employment based on actual or perceived sexual orientation."

We go to these lengths to analyze the California approach to show how a state can have a clear statement of statewide public policy from both the Supreme Court and the legislature that there can be no discrimination in employment for participation in the political process, and that gays are protected on this basis.

No other state, including Ohio, has taken this approach to protect gay rights. Despite the broad holding in the *Painter* syllabus, the *specific* holding of the case was that Shirley Painter could properly be fired for seeking partisan political office while employed as an unclassified civil service employee. A majority of the Painter court *specifically declined* to find some protection under the Ohio Constitution for Painter.[5]

We believe that if participation in the political process beyond the right to vote is to be protected, or found to be a fundamental right, such a pronouncement needs to come either from the General Assembly or from the Supreme Court

---

5. We note, however, that three judges dissented from the holding as applied to Painter herself.

interpreting the state Constitution or extending existing law.[6] At the present time, we cannot say that Greenwood's firing for his pro bono work for the Human Rights Ordinance and against Issue 3 violated public policy.

Greenwood also argues that his dismissal for working on an unpopular cause, opposition to Issue 3, was in violation of the Code of Professional Responsibility, which is a uniform set of ethical considerations and Disciplinary Rules promulgated by the Ohio Supreme Court, governing the conduct of all Ohio lawyers. In analyzing this theory, we agree with the Taft Firm's procedural contention that Greenwood is foreclosed from raising this issue because he failed to raise it in his complaint or to the trial court. Issues not raised at the trial court level cannot be raised for the first time on appeal. *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 43, 70 O.O.2d 123, 124, 322 N.E.2d 629, 630.

Summing up Greenwood's second assignment of error, we must agree with the Taft Firm that public policy sufficient to support an exception to the employment-at-will doctrine must be of uniform statewide application and we find no such statewide policy in this case. While I find it disturbing, if true, that an employee would be fired for the kinds of reasons unrelated to work performance which Greenwood alleges, any alleged wrong here is simply not one with a remedy under the present law of Ohio. Accordingly, Greenwood's second assignment of error is overruled.

In his first assignment of error, Greenwood alleges that the trial court erred in dismissing his privacy claim. Specifically, he alleges that he amended his employee benefit forms to list his male partner as the beneficiary of his insurance and pension benefits, and that staff within the Taft Firm shared this information with persons who had no responsibility for the administration of the programs and no need to know the information.

Both sides in this case agree that *Housh v. Peth* (1956), 165 Ohio St. 35, 59 O.O. 60, 133 N.E.2d 340, is the seminal case in Ohio on the tort of invasion of privacy. In the second paragraph of the syllabus, the court held that the following types of invasion of privacy are actionable: (1) the unwarranted appropriation or exploitation of one's personality; (2) the publicizing of one's private affairs with which the public has no legitimate concern, and (3) the

---

**6.** Most of the analysis in both the district and appellate decisions in *Equality Found., supra,* and the Colorado Supreme Court decision in *Evans v. Romer* (Colo.1994), 882 P.2d 1335, certiorari granted (1995), —— U.S. ——, 115 S.Ct. 1092, 130 L.Ed.2d 1061, devolve around the right to participate in the political process, albeit on constitutional grounds rather than in the context of wrongful discharge.

wrongful intrusion into one's private activities. Accord *Sustin v. Fee* (1982), 69 Ohio St.2d 143, 145, 23 O.O.3d 182, 183–184, 431 N.E.2d 992, 993, fn. 4.[7]

Both sides also appear to agree that it is prong number two, the publicizing of private facts, which is implicated here. We will refer to this as the disclosure tort. Prosser & Keeton on Torts (5 Ed.1984) 856, Section 117. According to Prosser, the elements of the disclosure tort are: (1) a clearly private fact; (2) public disclosure of the private fact; and (3) a showing that the matter made public is one which would be highly offensive and objectionable to a reasonable person. *Id.* See, also, Restatement of the Law 2d, Torts (1965), Section 652D, Publicity Given to Private Life.[8]

The Taft Firm argues that Greenwood has failed to allege an actionable disclosure tort because the disclosure was not public, as that term is defined in the Restatement, and the matter disclosed could not be highly offensive to a reasonable person. Apparently, the Taft Firm does not dispute the fact that sexual orientation is a private fact.

In determining whether Greenwood has pleaded a claim for the disclosure tort sufficient to withstand a Civ.R. 12(B)(6) motion, we are again, as with his claim of wrongful discharge, bound by the liberal rules afforded pleadings in the face of such motions. *Lawson Milk, supra.* The Ohio Supreme Court has twice recently reaffirmed the rule's stringent standard against dismissals, stating that "[a] Civ.R. 12(B)(6) dismissal based on the merits is unusual and should be granted with caution." *State ex rel. Lindenschmidt v. Butler Cty. Bd. of Commrs.* (1995), 72 Ohio St.3d 464, 467, 650 N.E.2d 1343, 1345–1346; *State ex rel. Edwards v. Toledo City School Dist. Bd. of Edn.* (1995), 72 Ohio St.3d 106, 109, 647 N.E.2d 799, 802.

We are limited to a review of the sufficiency of the pleadings in a Civ.R. 12(B)(6) motion. *State ex rel. Baran v. Fuerst* (1990), 55 Ohio St.3d 94, 97, 563 N.E.2d 713, 716. Greenwood has alleged in his complaint that he amended his employee benefit forms to list his male partner as the beneficiary of his insurance and pension benefits. It can be inferred from this listing that Greenwood is a gay male. If Greenwood had chosen to keep his sexual orientation private, and the firm's alleged disclosure "outed" him, a reasonable person may well have been

---

7. The one branch of tortious invasion of privacy recognized by Professor Prosser which Ohio does not recognize is publicity that unreasonably places the plaintiff in a false light before the public. *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666.

8. There are cases such as *Killilea v. Sears, Roebuck & Co.* (1985), 27 Ohio App.3d 163, 27 OBR 196, 499 N.E.2d 1291, and *McCormick v. Haley* (1973), 37 Ohio App.2d 73, 66 O.O.2d 132, 307 N.E.2d 34, which add additional elements such as an intentional rather than a negligent disclosure. We believe the three elements listed are those drawn from the Restatement.

offended by this disclosure. See Moretti, Outing: Justifiable or Unwarranted Invasion of Privacy? The Private Facts Tort as a Remedy for Disclosure of Sexual Orientation (1993), 11 Cardozo Arts & Ent.L.J. 857, 861–873. We note that pursuant to R.C. 3901.45(B) an insurer, in processing certain kinds of insurance or in determining insurability, may not take into consideration an applicant's sexual orientation, make any inquiry toward determining an applicant's sexual orientation, or direct any person who provides services to an insurer to investigate an applicant's sexual orientation.

Greenwood has specifically alleged in his complaint that the information about his male partner was shared "with persons who had no responsibility for the administration of the benefit programs and no need to know the information." Additionally, Greenwood pleaded that the Taft Firm disclosed confidential information about him without privilege to do so. Greenwood does not allege in his complaint that the information remained within the Taft Firm.

We decline to hold as a matter of law that no facts could exist, either under the Restatement definition of publicity or under an expanded interpretation, which would demonstrate a ground for recovery under the disclosure tort. In so holding we express no opinion on whether Greenwood will be able to prove his claim for invasion of privacy. We simply cannot say, at this early stage of the proceedings, that he can prove no set of facts to support his claim which will entitle him to relief.

The judgment of the trial court is affirmed in part and reversed in part. The matter is remanded with instructions to proceed on the disclosure claim in accordance with this opinion.

*Judgment accordingly.*

PAINTER and SUNDERMANN, JJ., concur separately.

PAINTER, Judge, concurring.

With respect to the employment issue in the second assignment of error, I concur in Judge Bettman's opinion and analysis. At least as the complaint is pleaded, appellant has stated no ground cognizable at law for avoiding the employment-at-will doctrine. Appellant asks this court to go very far out on the proverbial limb to bootstrap a public policy exception onto the alleged facts of this case. How far we would have to travel out that limb is unknowable, because there is no limb at all, not even a twig.

As to the first assignment of error, I concur in the judgment and in the analysis. Because of the liberal pleading standards of Civ.R. 12(B)(6), and because insufficient facts are before us, I believe that a determination of the

parameters of the "publicity" element of the private-facts disclosure tort must await another day.

SUNDERMANN, Judge, concurring.

I agree with the holding of the majority with regard to the second assignment of error, although not with all the analysis.

I concur with the holding on the first assignment of error because a Civ.R. 12(B)(6) motion limits us to a review of the pleadings. The complaint alleged the information was shared "with persons who had no responsibility for the administration of the benefits program and no need to know the information." Based on the pleadings alone these "persons" could be the entire public. The opinion seems to imply that a more expansive interpretation of the publicity requirement than that set forth in the Restatement might be applied. I feel the Restatement definition should be applied, see *Carriker v. Am. Postal Workers Union* (Sept. 30, 1993), Montgomery App. No. 13900, unreported, 1993 WL 385807, and the failure to prove disclosure outside the law firm, as admitted in appellant's brief, would subject this claim to a motion for summary judgment.