OPINION.
This is an employment action brought against The Jewish Hospital by Robert Hall, a surgical assistant fired for improper use of pain medication. Hall asserted claims for handicap discrimination (based upon an admitted addiction to pain medication), promissory estoppel, and invasion of privacy. The trial court granted summary judgment to the hospital on all three claims. Hall argues in his sole assignment of error that the record presented genuine issues of material fact that precluded judgment in favor of the hospital. We disagree and thus affirm.
 FACTS 1. Background
Prior to his employment as a surgical assistant by The Jewish Hospital in 1988, Hall began suffering from degenerative bone disease of the hips. The severe pain associated with this disease caused him to take prescription pain medication. By his own admission, Hall realized in the spring of 1993 that he had become addicted to the pain pills that he was taking at the time Vicodin, Lortab, Percocet. Without the pain medication, he realized, he would become physically sick within 24 hours. Hall testified that he immediately informed his wife of his addiction and tried unsuccessfully to end the addiction on his own.
Later in 1995, Hall told his supervisor at the hospital, Michael Bowen, of his addiction. Bowen told Hall that he would be given one opportunity to successfully complete a chemical-dependency treatment program provided by the hospital. Immediately after this conversation, Hall was hospitalized for a period of three to four days at the hospital's adult chemical-dependency unit.
Hall then began six weeks of intensive outpatient treatment. He testified that, after the first week of the program, he went back to Bowen and informed him that the program was "not for me" because it focused on problems at work and in the home that he felt did not apply to his situation. (Hall maintained that his dependency on pain medication did not have any negative effect on his work performance.) Bowen, according to Hall, was not sympathetic and told him that he had to complete the six-week program.
Hall admitted on deposition that he continued taking prescription pain medication during the program. He testified that he was under the impression that after he had completed the six-week program, the treatment would stop; however, he was next informed that there was an additional period of "aftercare." On December 15, 1993, he signed a "Reentry Agreement," in which he agreed to "completely abstain from mood-altering drugs (alcohol, sedations, stimulants, narcotics, soporifics, over-the-counter drugs, etc.) except on prescriptions from my family physician." The agreement also required Hall to submit to random drug tests, stating further that if the tests revealed "mood-altering substances," he would be subject to disciplinary action that might include termination. At the end of the agreement, the following language appeared:
 I understand that this agreement in no way establishes a contract of employment. I further understand that my employment with The Jewish Hospital is at-will, meaning I am free to discontinue my employment at any time for any reason, and the hospital reserves the right to do the same with or without reason or without notice. Only the President of Jewish Hospital may change, in writing[,] this employment-at-will relationship.
Hall testified that he believed, and had, in fact, been told, that the terms of the agreement did not prohibit him from continuing to take prescription pain medication. According to Hall, the prescription pain medicine that he was addicted to was not "mood-altering." The purpose of his continued use of the pain medication, Hall testified, was solely to stave off the illness associated with withdrawal. In his words, "I was not getting high * * *."
Hall testified that throughout 1994 and 1995 he continued to take prescription pain medication on a daily basis. He stated that no one was aware of his continuing use of the medication, not even his wife. Hall stated that he did not feel free to divulge his continuing addiction to his supervisors at the hospital for fear of losing his job. According to Hall, he would keep the medication in his locker at work, his pocket, his car, or at home. He stated that in the early part of 1995 his use was at an average of 50-60 pills a day. (Poignantly, Hall testified, "I remember one time I had counted the pills, and the next day I counted them again and I went, oh, my God."). He stated that he was able to supplement his prescriptions by obtaining pills from "old associates" (not in the medical field) who would occasionally charge him. Hall denied ever buying pills from anyone at Jewish Hospital.
At the end of May 1995, Hall testified, he realized that he was starting to get sick whether he took the pills or not, although the symptoms were much more severe when he did not take any medication. At that point, he tried to quit "cold turkey" but found that he could not do so. He resolved, however, to no longer have his prescriptions refilled.
Hall testified that he then began to obtain pills from Kirby Blye, a transporter at the hospital who, according to Hall, was unaware of Hall's addiction. Hall stated that Blye gave him the pills out of a prescription that Blye had legitimately obtained for a back injury that had kept Blye out of work for a six-month period. Hall testified that Blye gave him the pills as an act of friendship and vehemently denied that Blye in any manner attempted to sell him the pills. (Hall testified, "And I said to Kirby, I said, Kirby, did you bring any extra of your pain pills in today. He says, I might have a couple of extra, Rob. I said, would you mind giving them to me. He says, if I got them, man, he says, you're welcome to them.")
Hall testified that during the month or so before July of 1995 Blye gave him pain pills on several occasions. Hall described the situation as follows:
 There was never ever money-drugs, never. He had given me on about four or five, six occasions, a couple here, a couple there, because I was going through withdrawal and I was trying to get off the drugs.
 And one day I seen him in the hall, and I just went to shake hands with him, but I had some money in my hand and gave it to him, and he's sitting there, Rob, you know this isn't necessary, and tried to give it back.
 I said, Kirby, just take it, I know you need it, you've been out of work for six months. I said, I know you could use it, just go ahead and take it.
 Because I made good money, I mean, far more than what he was making. And he was doing me a favor, I mean, he was keeping me from being sick.
 And I don't know, I don't make anybody understand that. It was no different than you lending me a dollar, there was no difference.
 2. The Final Days
Hall testified that on July 18, 1995, he was called in for a urinalysis. He stated that at that time he was taken to a security office where Allen Jones, head of hospital security, and members of the Regional Enforcement Narcotics Unit (RENU) were there to meet him. Hall stated that the members of RENU accused him of buying drugs from Blye, which he strongly denied. According to Hall, the RENU members described Blye as a "dealer." Hall insisted that Blye was just being a friend by providing him with the pills necessary to alleviate his withdrawal symptoms.
Hall testified that the RENU members then told him that they realized that he was "a victim," but that Blye needed to be removed from the hospital. He stated that he was then asked to wear a wire while trying to get Blye to sell him some pills. According to Hall, one of the RENU members then stated, "Look, Rob, * * * your job is depending on this." Hall testified, "And I said, I said, what are you saying. They said, if you wear this wire, your job, it's very favorable for you to, for your job."
Hall testified that he started to walk out of the meeting, feeling uncertain of his course of action, when one of the RENU members again advised him that wearing the wire would be "very favorable for your job." Hall stated that he then asked Jones, as a member of the hospital staff, if this were true. He stated that Jones "shook his head yes." At that point, Hall testified, he agreed to wear the wire because he was certain that Blye would not accept money for the pills.
Hall testified that he reported to work the next morning and was outfitted with the wire. According to Hall, he was "under the impression" that if he wore the wire "they would at least hear me out and that I, I have a good chance of keeping my job." He testified that Jones verbally assured him that this was true. Hall testified, "When I walked out of there wired, I was thinking, you know, I got a real good chance here, I was under that impression that I still had a real good chance of keeping my job, because that was the most important thing for me." Asked, however, if Jones ever expressly promised him that he would keep his job, Hall responded, "No, he didn't say, yeah, by you doing this, you got a job. He did not say that, no. But I was under the impression that I had a good chance of keeping my job."
Hall was then given a five-dollar bill and dispatched to purchase some pills from Blye. Hall testified that he then found Blye at the front desk and asked him if he had brought "any extra with you today." When Blye responded that he had, Hall asked to "borrow a couple" and informed Blye that he would be glad to pay for them. According to Hall, Blye refused the offer, saying "no, man, that's not necessary." Hall testified that, despite further encouragement, Blye never accepted money for the pills.
Hall testified that afterward he went directly to the security office, where he was informed by Jones that he was being suspended without pay "until the end of the investigation." According to Hall, Jones denied that he was being fired. That very day, however, the hospital called Hall's home and informed his wife that he had been fired. On the next day, July 20, the hospital sent Hall a letter informing him that his employment had been terminated as a result of an investigation by the security department. Specifically, Hall was informed that his actions on July 14, 1995, and July 18, 1995, violated the hospital's personnel policy prohibiting "the use, sale, purchase, transfer, or possession of an illegal drug during working or non-working time, whether or not on Jewish Hospital property, or while performing Jewish Hospital business."
 ANALYSIS 1. Handicap Discrimination
Initially, Hall argues that the trial court erred by granting the hospital summary judgment on his claim of handicap discrimination in violation of R.C. 4112.02(A). We disagree.
R.C. 4112.02(A) provides that it is illegal for an employer to "discharge without just cause" or otherwise discriminate against a person because of a handicap. To establish a prima facie case of handicap discrimination under this section, the plaintiff must show (1) that he or she is handicapped, (2) that job action was taken by the employer based, at least in part, on the handicap, and (3) that notwithstanding the handicap, the plaintiff could substantially perform the essential functions of the job in question with reasonable accommodation. Wooten v. Columbus
(1993), 91 Ohio App.3d 326, 632 N.E.2d 605.
Both parties recognize that drug addiction is a statutorily defined handicap. R.C. 4112.02(A)(16)(a)(iii); see, also,Hazlett v. Martin Chevrolet, Inc. (1986), 25 Ohio St.3d 279,496 N.E.2d 478. In Starr v. Delta Air Lines, Inc. (Dec. 29, 1995), Hamilton App. No. C-950217, unreported, we acknowledged this fact. We also noted that, under the federal American with Disabilities Act, Section 1201 et seq., Title 42, U.S. Code ("ADA"), "disability" is defined to include drug addiction. Section 1630.3(a) through (c) and 1630.16(b), Title 29, C.F.R.
However, both laws exclude from protection employees who are currently engaged in the illegal use of drugs. R.C.4112.02(Q)(1)(a) and Section 12114(b), Title 42, U.S.Code. The statutory schemes provide a safe harbor to drug addicts if, but only if, they can fit into one of three categories. The three categories require that the employee either (1) have successfully completed a drug rehabilitation program and be no longer engagedin the illegal use of drugs, or (2) be participating in a supervised rehabilitation program and be no longer engaged inthe illegal use of drugs, or (3) be erroneously regarded as engaging in the illegal use of drugs. R.C. 4112.02(Q)(1)(b) and Section 12114(b), Title 42, U.S.Code.
It is Hall's contention that he fit into the second of these categories. He argues that because he was "arranging" to enter a treatment program in Indiana at the time of his dismissal, he was entitled to the same protection that would have obtained if he were actually in a program.
Obviously, arranging to go into a program is not the same as having completed a program or being currently enrolled in a program. Even, however, if we were to ignore the language of the statute and expand the safe harbor to include arrangements for going into a rehabilitation program, it is clear that Hall would still not satisfy the second part of the requirement — that, at the time of his dismissal, he was no longer using illegal drugs. Hall was, by his own admission, improperly obtaining prescription pain medication from Blye at work up until the day that he was fired.
It bears emphasis that the protection the safe harbor affords is to rehabilitated or rehabilitating drug addicts who have actually stopped using drugs. "The policy objective behind the safe harbor has been construed as preventing employers from firing persons on the basis of their past drug use." Starr,supra, citing Wormley v. Arkla, Inc. (E.D.Ark. 1994),871 F. Supp. 1079 (emphasis supplied.). Current drug use, however, is a different matter. As we noted in Starr, courts have generally interpreted the ADA safe harbor to apply to drug-addicted employees who not only are drug-free, but have been so for a considerable period of time. Immediate abstinence, therefore, does not qualify; rather, the abstinence must be of sufficient length to demonstrate that the chemically dependent person is stable and either recovered or recovering from his or her addiction. See, e.g., McDaniel v. Mississippi Baptist Med. Ctr. (S.D.Miss. 1995), 877 F. Supp. 321. Significantly, the Equal Employment Opportunity Commission's Technical Assistance Manual for the ADA provides in Section VIII-1-2 that "current drug use means that the illegal use of drugs occurred recently enough to justify an employer's belief that involvement with the drugs is an on-going problem."
We hold that, as matter of law, Hall was not able to avail himself of the safe-harbor protections of R.C. 4112.02 because the evidence concretely established that he was not abstaining from the illegal use of drugs at the time of his termination.
 2. Promissory Estoppel
In his second assignment of error, Hall argues that the evidence was sufficient to raise a jury question on whether he was entitled to continued employment based upon promises made to him by Jones that his cooperation with RENU would be "favorable to his job." Again we disagree.
The parties do not dispute that Hall was an at-will employee of the hospital. Language in the Reentry Agreement signed by Hall in December of 1993 underscored this fact by iterating that his employment remained at-will and that the hospital reserved the right to terminate his employment "without reason or without notice." The Reentry Agreement also stated that "[o]nly the President of Jewish Hospital may change, in writing[,] this employment-at-will relationship."
While it is true that oral promises made by an employer may alter an employment-at-will agreement, there must be a clear, unambiguous promise of continued employment upon which the employee could reasonably rely. Weiper v. W.A. Hill Assoc.
(1995), 104 Ohio App.3d 250, 661 N.E.2d 796, 803. Here, all that was said to Hall was that his cooperation in wearing the wire would be viewed favorably with respect to his job. We hold that, as a matter of law, such a statement was not a clear, unambiguous promise of continued employment. Indeed, it is clear from Hall's own testimony that even he did not consider it as such — Hall testified that he understood the statement as meaning no more than he had "a good chance" of keeping his job, which was not the same as a promise that he would have a job. Finally, we note that the statements were made by Jones, the head of hospital security, and there is absolutely no evidence of record to demonstrate that he had the authority to make promises of employment for the hospital, or that Hall had any reason to believe that he possessed such authority. As noted, the Reentry Agreement specifically advised Hall that only the president of the hospital could alter the at-will nature of his employment, and that such alteration would have to be in writing.
Accordingly, we hold that the record does not create any issue of material fact with respect to Hall's promissory-estoppel claim, and that the hospital was entitled to judgment as a matter of law.
 3. Invasion of Privacy
Finally, Hall argues that the trial court erred by granting summary judgment on his invasion-of-privacy claim. Specifically, he argues that the record creates issues of material fact concerning his allegation that the hospital improperly made public the fact of his addiction, which he had tried so hard to conceal. As evidence of this, Hall cites to the fact that his co-workers at the hospital became aware of his addiction "almost immediately" after his termination, as well as to his loss of certain job prospects as a surgical assistant after his termination.
As this court has previously noted, in order to establish a claim of tortious invasion of privacy, a plaintiff is required to produce evidence that the area intruded upon was private, and that the intrusion by the defendant was unwarranted and offensive or objectionable to the reasonable man. Contandino v. Tilow
(1990), 68 Ohio App.3d 463, 470-471, 589 N.E.2d 48, 53. One form of actionable invasion of privacy, the type alleged by Hall against the hospital, is the publicizing of a person's private affairs with which the public has no legitimate concern. Houshv. Peth (1956), 165 Ohio St. 35, 133 N.E.2d 340. The elements of such a tort are (1) a clearly private fact; (2) public disclosure of the fact; and (3) that the matter made public is one that would be highly offensive and objectionable to a reasonable person. Greenwood v. Taft, Stettinius Hollister (1995),105 Ohio App.3d 295, 303, 663 N.E.2d 1030, 1035. See, also, Restatement of the Law 2d, Torts (1965), Section 652D, Publicity Given to Private Life.
Though questioning whether Hall's drug addiction could be deemed private given the circumstances of his termination, the trial court based its decision to grant summary judgment upon the lack of evidence that the hospital communicated the fact of Hall's addiction to the public at large. Upon analyzing the evidence, the trial court concluded that, at most, there was some evidence that another surgical assistant, Dan Belaperio, may have learned of the cause for Hall's dismissal. However, as the trial court noted, Belepario testified that he knew, prior to Hall's termination, that Hall had some kind of drug problem, because other surgical assistants had to fill in for him while he was in the hospital drug-rehabilitation program.
The only other instance of a possible disclosure, the trial court determined, was evidence that Sue Angelica, a person in charge of scheduling for the Franciscan Hospitals, rejected Hall based upon "non-specific information she had received from a friend at Jewish." While Angelica admitted to speaking to Belaperio about Hall, there was no evidence that they discussed Hall's drug problem specifically.
We agree with the trial court that "reasonable minds, even viewing the evidence in the light most favorable to [Hall], could not find any public disclosure of the nature contemplated by [the tort of invasion of privacy]." Furthermore, unlike other matters, such as a person's sexual orientation, see Greenwood, supra, that have very little significance in the workplace, Hall's addiction directly spilled over into the workplace when he began procuring pills from Blye, a fellow employee, in the common areas of the hospital, and was caught and punished for doing so. As we held in Contadino, a case involving a crisis-intervention counselor who had himself become suicidal due to depression and cluster headaches, sometimes a person's physical and mental condition becomes a legitimate matter of interest in the workplace. Even Hall admitted that he voluntarily disclosed his drug addiction to prospective employers following his termination from Jewish Hospital, thus tacitly admitting that his addiction was not an aspect of his professional career that, realistically, he would have expected to be able to conceal.
In sum, we hold that the record does not disclose any issue of material fact with respect to any of Hall's three claims, and therefore that the trial court did not err in entering summary judgment in favor of the hospital. Accordingly, the judgment of the trial court is affirmed.
Judgment affirmed.
 SUNDERMANN and WINKLER, JJ., concur.