DAUP et al., Appellants,

v.

TOWER CELLULAR, INC. et al., Appellees.

[Cite as *Daup v. Tower Cellular, Inc.* (2000), 136 Ohio App.3d 555.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 99AP–258.

Decided Feb. 3, 2000.

556

---

*Tyack, Blackmore & Liston* and *Jonathon R. Tyack,* for appellants.

*Vorys, Sater, Seymour & Pease, L.L.P.,* and *Paula J. Lloyd,* for appellees.

**558**

DESHLER, Judge.

This is an appeal by plaintiffs, Jeff Daup and Shawn Owens, from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants, Colin S. LeVeque and Tower Cellular, Inc.

This action was initiated after plaintiffs were terminated in October 1996 from their employment with defendant Tower Cellular, Inc. ("Tower Cellular"). Defendant LeVeque is the president of Tower Cellular. In the early 1990s, Tower Cellular formed an agency relationship with Cellular One (which later became Airtouch Cellular). Pursuant to the parties' sales referral agreement, Tower Cellular received a commission for signing up customers for Cellular One service agreements.

Tower Cellular employed a staff of sales personnel, sometimes referred to as account executives. Plaintiffs, Daup and Owens (collectively "plaintiffs"), were initially hired to work as account executives and they were compensated in the form of commissions. Plaintiffs were also eligible for certain performance bonuses. Later during their employment, plaintiffs also received payments in the form of "overrides" and "residuals."

In general, the payment of commissions was based on individual sales by an account executive; the amount of commission was determined by the rate plan and number of years for which a customer signed up, minus any "giveaways" an account executive might offer the customer. A number of different bonuses were available, including bonuses based on the number of "activations" initiated by an account executive, as well as individual store bonuses, based on the number of sales generated by a particular store.

"Overrides" were paid to managers based on sales by personnel working under a particular manager. Overrides were calculated based on an amount multiplied by "the number of sales" in a group. Bonuses and overrides were categorized as "additional compensation" above the standard commission.

The term "residual" refers to "a percentage of a customers' revenue." Customer revenue included a customer's monthly long-distance charges. Cellular One paid Tower Cellular a percentage of the residuals on a monthly basis, ranging "anywhere from * * * 2 percent to 7 percent." The percentage was based on the number of customers (customer base) and the deactivation rate (*i.e.,* a lower deactivation rate would result in a higher residual).

In 1995, Tower Cellular had three stores, located in Westerville, Worthington, and downtown Columbus. At that time, LeVeque managed the Worthington office, consisting of not only a sales office but also the corporate headquarters.

Defendant Daup was hired in March 1995 by Tower Cellular. When he first began his employment, Daup worked at the Westerville store as an account executive and he was compensated on a commission basis. In June 1995, Daup transferred to the office in Worthington.

LeVeque eventually discussed with Daup the possibility of Daup operating his own store. As a result of these discussions, a fund was created whereby thirty dollars override payments were set aside for the purpose of setting up an independent store for Daup to operate as a sub-agency with Tower Cellular. The override payments resulted from sales by Daup and the employees working under Daup's management.

Daup subsequently contacted a friend, defendant Owens, about working at Tower Cellular. Owens began working at Tower'Cellular on July 16, 1995. He became an account executive and was paid on a commission basis. Daup anticipated that Owens would be his partner in the new business.

Because of favorable sales performance at the Worthington store, LeVeque spoke with Daup about abandoning the idea of opening a new store; instead, LeVeque wanted Daup and Owens to concentrate on developing business at the Worthington store. Daup and Owens had recruited a number of sales personnel at the time and were involved in managerial duties of sales people. As a result of these discussions, Daup and Owens each gave themselves the title of vice-president. Further, instead of setting aside the thirty dollar overrides earmarked for the new store, portions of the fund were paid "up-front" or directly to Daup and Owens. According to LeVeque, the change came about because "[w]e agreed that everybody was better off having them stay in the Worthington location."

LeVeque also agreed to pay Daup and Owens residuals. Specifically, LeVeque agreed to pay Daup and Owens two percent of Tower Cellular's residuals received from Cellular One (Daup and Owens split their income, each receiving one percent). Plaintiffs were not to begin being paid the residuals until one year later.

In October 1996, LeVeque informed both Daup and Owens that they were being terminated. LeVeque indicated that the reason for the termination was his fear that the company might be sued for sexual harassment based on office conduct by Daup and Owens.

On September 29, 1997, plaintiffs filed a complaint against defendants, alleging that defendants had breached an express or implied contract between plaintiffs and Tower Cellular. Plaintiffs alleged that, due to the breach of contract, they were entitled to residuals, finder's fees, and other compensation based on each new customer plaintiffs brought to Tower Cellular and the amount of telephone

services purchased by sales customers. Plaintiffs' complaint also included causes of action for quantum meruit, intentional infliction of emotional distress, fraudulent misrepresentation, defamation, intentional procurement of breach of contract, and promissory estoppel.

Defendants filed an answer on November 6, 1997. On October 30, 1998, defendants filed a motion for summary judgment as to all of plaintiffs' claims. Plaintiffs filed a memorandum contra defendants' motion for summary judgment, and defendants subsequently filed a reply memorandum.

By decision rendered on January 20, 1999, the trial court granted defendants' motion for summary judgment. The decision of the trial court was journalized by judgment entry filed January 21, 1999.

On appeal, plaintiffs set forth the following assignment of error for review:

"The trial court erred in granting defendants' motion for summary judgment as genuine issues of material fact exist such that defendants are not entitled to judgment as a matter of law."

Under their single assignment of error, plaintiffs contend that the trial court erred in granting summary judgment as to plaintiffs' claims for breach of an express or implied contract, unjust enrichment, fraud, and tortious interference with contract.

In general, a motion for summary judgment will be granted only where there is no genuine issue of any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). Further, summary judgment shall not be rendered unless it appears from the evidence that "reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made." *Id.* In reviewing a motion for summary judgment, the non-moving party is "entitled to have the evidence * * * construed most strongly in the party's favor." *Id.*

We will initially consider plaintiffs' contention that the trial court erred in granting summary judgment on plaintiffs' claim that defendants breached the implied terms of a contract between the parties relating to plaintiffs' continued employment with Tower Cellular.

 In the present case, it is undisputed that plaintiffs did not have a written contract of employment. Under Ohio law, "[u]nless otherwise agreed, either party to an oral employment-at-will employment agreement may terminate the employment relationship for any reason which is not contrary to law." *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 19 OBR 261, 483 N.E.2d 150, paragraph one of the syllabus. Thus, "under the employment-at-will doctrine, the employment relationship between employer and employee is terminable at

the will of either," and an employee "is subject to discharge by an employer at any time, even without cause." *Wright v. Honda of Am. Mfg., Inc.* (1995), 73 Ohio St.3d 571, 574, 653 N.E.2d 381, 384. However, "[t]he terms of discharge may be altered when the conduct of the parties indicates an intent to impose different conditions regarding discharge." *Condon v. Body, Vickers & Daniels* (1994), 99 Ohio App.3d 12, 18, 649 N.E.2d 1259, 1263.

In *Wright, supra,* the Ohio Supreme Court noted two exceptions to the employment-at-will doctrine: "(1) the existence of implied or express contractual provisions which alter the terms of discharge; and (2) the existence of promissory estoppel where representations or promises have been made to an employee." *Wright, supra,* at 574, 653 N.E.2d at 384. In the instant case, plaintiffs maintain that the first exception applies, *i.e.,* that defendants made implied promises of continued employment.

In *Corradi v. Soclof* (May 25, 1995), Cuyahoga App. No. 67586, unreported, 1995 WL 322311, the court noted:

"Consistent with the presumption of at-will employment, it is recognized that 'the party asserting an implied contract of employment has a heavy burden. * * * [Plaintiff] must prove the existence of each element necessary to the formation of a contract.' *Penwell v. Amherst Hospital* (1992), 84 Ohio App.3d 16, 21 [, 616 N.E.2d 254, 257–258] * * *. *Rudy v. Loral Defense Sys.* (1993), 85 Ohio App.3d 148, 152 [, 619 N.E.2d 449, 452] * * *. Therefore, plaintiff must show a 'meeting of the minds' of the parties that the employment was other than at-will. *Schwartz v. Comcorp., Inc.* (1993), 91 Ohio App.3d 639 [, 633 N.E.2d 551] * * *; *Turner v. SPS Technologies* (June 4, 1987), Cuyahoga App. No. 51945, unreported [, 1987 WL 11967]."

In support of plaintiffs' assertion that the at-will nature of their relationship with defendants was altered, plaintiffs point to various statements made to them by defendant LeVeque. During his deposition, Daup testified about one such discussion in which he stated that LeVeque told him:

" * * * [Y]ou are going to be my—you know, my right-hand guy for a long, long time. We are going to have many other businesses. We are going to have many other ventures together. We have a great sales staff here. We will implement new products with them. You know, see the big picture. Look at this five, ten years from now. Look where you are going to be. Look how well you are doing now. It's just going to get bigger and better.

"And so was there an exact date set? No. But to me, five, ten years came up all the time."

Daup further testified that he and LeVeque would go to lunch and LeVeque would tell him, "we were going to get into something else and that we could move

our sales force into another opportunity * * *. And * * * he always told me to look at the big picture and see yourself five years from now."

Plaintiff Owens testified during his deposition that he recalled a number of discussions he had with LeVeque regarding the cellular market and how long it might last due to changes in the industry. Owens testified that LeVeque assured him that "we had a strong sales force," and that LeVeque "foresaw a relationship that would be very long and would go into the future with other properties and services." Owens testified that he had established a lifestyle "that required certain income." According to Owens, he spoke with LeVeque about his desire to purchase an expensive automobile, and LeVeque told him that he was "only young once," and that he "might as well enjoy it." Owens stated that LeVeque "consistently assured me that he wanted the relationship to be very long, and he foresaw it being through many other business opportunities down the road."

■ Under Ohio law, "[s]tatements praising job performance or promising career advancement opportunities do not alter an at-will status." *Corradi, supra,* citing *Helmick v. Cincinnati Word Processing, Inc.* (1989), 45 Ohio St.3d 131, 543 N.E.2d 1212, paragraph three of the syllabus ("Standing alone, praise with respect to job performance and discussion of future career development will not modify the employment at-will relationship").

A number of appellate courts have held that statements praising an employee's work performance or discussions regarding future opportunities are insufficient to establish an express or implied contract of employment altering an at-will relationship. See, *e.g., Anders v. Specialty Chem. Resources, Inc.* (1997), 121 Ohio App.3d 348, 351, 700 N.E.2d 39, 41–42 (employer's statements assuring employee of a "secure future," a "secure career," and that he could be terminated only for inadequate performance insufficient to establish express or implied contracts or promissory estoppel); *Condon v. Body, Vickers & Daniels, supra,* at 19, 649 N.E.2d at 1263–1264 (statements by employer that firm was looking for associate to participate in five-year training program and statements that employee had a job as long as he did not "use the Firm or date the secretaries" found insufficient to establish an implied contract altering employee's at-will status); *Clipson v. Schlessman* (1993), 89 Ohio App.3d 230, 233, 624 N.E.2d 220, 222 (statements to employee that he was "in a good position with the company" and that he would "never have to worry about [his] job" indicate, at best, praise of employee's performance and discussions of his future, but not evidence of an employment promise); *Peters v. Mansfield Screw Machine Products* (1991), 73 Ohio App.3d 197, 200, 596 N.E.2d 1071, 1073–1074 (supervisor's statement that employee would have a job as long as the supervisor was there did not alter employee's at-will status); *Healey v. Republic Powdered Metals, Inc.* (1992) 85 Ohio App.3d 281, 284, 619 N.E.2d 1035, 1036–1037 (employee's at-will contract not

modified by statements praising employee and telling him on his thirty-seventh anniversary with the company that he would be the first company employee to work there for fifty years); *Lake v. Wolff Bros. Supply, Inc.* (Nov. 10, 1993), Cuyahoga App. No. 63959, unreported, 1993 WL 462866 (summary judgment properly granted in favor of employer despite statements by employer discussing career advancement opportunities and telling employee not to worry, "[i]f you do this well, you will have this position forever").

In the present case, we conclude that the representations cited by plaintiffs are insufficient, as a matter of law, to establish an implied contract of continued employment. The statements at issue primarily concern discussions of future career development or opportunities and not continuing employment. As noted by defendants, there is no evidence that representations were made indicating that plaintiffs' employment was secure regardless of their workplace conduct, and it is not disputed that certain workplace misconduct occurred. Further, Daup acknowledged that LeVeque did not promise employment for a specific duration; rather, LeVeque made only general statements about looking at the "big picture" five or ten years down the road. Such statements do not constitute a "clear and unambiguous promise of continued employment for a specific period as required by Ohio law." *Corradi, supra,* citing *Eagleye v. TRW, Inc.* (Feb. 17, 1994), Cuyahoga App. No. 64662, unreported, 1994 WL 50671 (affirming summary judgment in favor of employer and finding no specific promise of continued employment where employee was told, "If you stick with me for three to five years, I will give you Kovicky's job."). Moreover, vague, indefinite promises of future employment or " 'mere representations of future conduct without more specificity' do not form a valid basis for the application of the doctrine of promissory estoppel." *Scanlon v. Tremco, Inc.* (Dec. 3, 1998), Cuyahoga App. No. 73808, unreported, 1998 WL 842145. Accordingly, we conclude that the trial court did not err in finding that the statements did not create genuine issues of material fact as to whether plaintiffs' at-will employment status had been modified.

We next address plaintiffs' contention that the trial court erred in failing to find genuine issues of material fact regarding plaintiffs' claims for payments of residuals and overrides. Again, similar to plaintiffs' claim for continued employment, there is no written agreement between the parties regarding the payment of residuals and overrides for an indefinite period of time. Plaintiffs contend, however, that defendant LeVeque made express oral representations that plaintiffs would be paid residuals and overrides in return for giving up the opportunity to open their own store.

Regarding the issue of override payments, plaintiff Daup testified during his deposition that "part of the reason why we accepted Mr. LeVeque's proposal to

stay at Worthington was this promise that we would * * * continue to receive the $30 override on all of our salespeople as long as they worked there." Daup stated that his sales force was "the No. 1 sales force in Columbus," and that after he and Owens were terminated the sales force "continued to make all that money for Tower, but we didn't receive any of the $30 override on those people."

Daup also testified as to the alleged promise by defendants to pay residuals indefinitely. According to Daup, at the time of the discussions between LeVeque and plaintiffs about remaining at the Worthington store and foregoing the opportunity to open a new store, LeVeque "promised us a two percent residual on all of the sales that myself, Shawn and all of the salespeople we had recruited had made." Daup stated that this arrangement was to "start one year later," and thus was to be effective as of October 1996. The compensation was limited to residuals related to the sales people recruited by plaintiffs and the sales people that plaintiffs were directly managing. Daup testified that LeVeque promised that "as long as the salespeople work here, you will receive residuals on their activations," and that "[a]s long as you work here, you will receive residuals on your activations." Daup testified that LeVeque promised that plaintiffs would receive the residual "for as long as he received it." When Daup asked LeVeque whether this meant that, "five years from now when I am sitting on the beach retired I am still going to be receiving a residual," LeVeque responded "yes."

Plaintiff Owens testified in his deposition that, as to the residual income, "we were told * * * we would be compensated that income for as long as those customers were with Cellular One, which changed over to Airtouch Cellular." Owens stated that it was his understanding that they would be entitled to residuals as long as a customer recruited by plaintiffs or plaintiffs' sales force remained a customer of Airtouch Cellular; thus, if a customer renewed his or her contract with the company, Owens believed that plaintiffs would continue to receive residual payments. Owens testified that LeVeque "made several statements along the line of, as long as he received the compensation from Cellular One or Airtouch or whoever it would be at that time, as far as the residual goes, we would be compensated indefinitely."

Daup also testified that, at the time he and Owens were terminated, LeVeque told plaintiffs "he would pay us residuals for one year." Daup stated that he received residuals "for a few months," but that LeVeque then stopped the payments. Owens similarly testified that, at the time he and Daup were terminated, LeVeque promised to pay them residuals for one year. Owens indicated that he received residual payments "[f]or a few months." Owens further stated that each residual payment he received after his termination contained "a significant number of deductions from the residual compensation due to customer issues or problems."

■ At the outset, we address the issue whether an oral promise to pay residuals indefinitely following the termination of an at-will employment relationship is enforceable under the Statute of Frauds. R.C. 1335.05, Ohio's Statute of Frauds, states:

"No action shall be brought whereby to charge the defendant * * * upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized."

At least one jurisdiction has held that "[a] service contract of indefinite duration, in which one party agrees to procure customers or accounts or orders on behalf of the second party, is not by its terms performable within a year and hence must be in writing * * * since performance is dependent, not upon the will of the parties to the contract, but upon that of a third party." *Zupan v. Blumberg* (1957), 2 N.Y.2d 547, 550, 161 N.Y.S.2d 428, 141 N.E.2d 819. In *Sibbring v. Columbus Financial Planning Agency, Inc.* (Feb. 18, 1982), Franklin App. No. 81AP–26, unreported, 1982 WL 3981, this court adopted the reasoning of the court in *Zupan, supra,* in holding that an alleged oral contract between plaintiff, an insurance agent, and defendants to pay commissions to plaintiff indefinitely was not susceptible of being performed in one year, and therefore the contract fell within the Statute of Frauds.

One court has noted that the rationale of cases such as *Zupan* is that "the timing of performance is not controlled by the parties to the contracts, but rather is controlled by the customers, who are third parties to the contracts." *Riley v. N.F.S. Serv., Inc.* (S.D.N.Y.1995), 891 F.Supp. 972, 976. Thus, "[t]he uncertainty of the timing of performance brings these contracts within the Statute of Frauds." *Id.* As noted in the instant case, Owens testified in his deposition that he believed the residual payments he was purportedly promised could be paid for years in the future because of the fact that customers could renew their service commitment with the cellular company.

■ We find persuasive this court's rationale in *Sibbring, supra,* that, where a defendant's obligation to perform under an oral agreement is contingent upon the future acts of a third party and will continue for an indefinite period of time in the future, such contract falls within the Statute of Frauds. See, also, *Zupan, supra; Apostolos v. R.D.T. Brokerage Corp.* (1990), 159 A.D.2d 62, 559 N.Y.S.2d 295, 297 ("a promise to pay commissions that extends indefinitely, dependent solely on the acts of a third party and beyond the control of the defendant, is within the statute and must be in writing"). But, see, *Weiper v. W.A. Hill & Assoc.* (1995), 104 Ohio App.3d 250, 264, 661 N.E.2d 796, 805–806 (employment contract proposed by at-will employee to employer to pay commissions to

employee or his estate following termination of employment was not within Statute of Frauds since employer's alleged promise to pay postemployment commissions to employer's estate was capable of being performed within one year if employee died shortly after entering into agreement).

■ Although we conclude that an oral agreement for the payment of overrides or residuals for an indefinite period in the future falls within the Statute of Frauds, we further note that, under Ohio law, the Statute of Frauds "can be overcome or rebutted by using the doctrine of promissory estoppel." *DeCavitch v. Thomas Steel Strip Corp.* (1990), 66 Ohio App.3d 568, 572, 585 N.E.2d 879, 882, citing *Gathagan v. Firestone Tire & Rubber Co.* (1985), 23 Ohio App.3d 16, 23 OBR 49, 490 N.E.2d 923; *Mers, supra;* and *Kelly v. Georgia–Pacific Corp.* (1989), 46 Ohio St.3d 134, 139, 545 N.E.2d 1244, 1249–1250. In *Gathagan, supra,* the court held that where a party seeks to rebut or overcome the defense of Statute of Frauds by using the doctrine of promissory estoppel, the issue of "whether the promisee's reliance is sufficient to estop the promisor from raising the statute as a bar is a question of fact to be decided by the trier of fact." *Id.* 23 Ohio App.3d at 18, 23 OBR at 51, 490 N.E.2d at 925.

■ In the present case, there exists a genuine issue of material fact whether plaintiffs were promised post-termination override and residual payments, and questions of fact remain as to the extent, if any, of plaintiffs' reliance on such promises. Thus, we find that the trial court's resolution of these issues by summary judgment was inappropriate. Further, we agree with plaintiffs that there remains an issue of fact as to whether plaintiffs are entitled to some amount of residual payment based on defendant LeVeque's promise to pay plaintiffs residuals for one year following their termination. LeVeque acknowledged in his deposition testimony that he told plaintiffs, at the time of their termination: "I will pay you the residual for 12 months, but I will deduct out of those any deacts, customer problems, any issues that arise." Accordingly, the trial court's granting of summary judgment as to plaintiffs' claims relating to alleged agreements to pay override and residual payments must be reversed.

Plaintiffs also contend that the trial court erred in granting summary judgment as to plaintiffs' claim for intentional procurement of a breach of contract. Count six of plaintiffs' complaint alleged that plaintiffs were parties to an express or implied contract with defendant Tower Cellular, under the terms of which plaintiffs were to be compensated by commissions, finders fees, residuals, and other forms of compensation for the customers brought to the business by plaintiffs or their sales people. It was alleged that defendant LeVeque knew of the contract and intentionally procured the breach of the contract between plaintiffs and Tower Cellular.

█ Ohio law recognizes the tort of tortious interference with a contractual relationship. *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863, paragraph one of the syllabus. In *Kenty,* the Ohio Supreme Court held in paragraph two of the syllabus:

"In order to recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages."

At the outset, we note that, we have previously found the absence of any genuine issue of material fact as to whether plaintiffs' at-will employment status was altered. Thus, no issue of fact exists regarding tortious interference with an alleged contract for continued employment.

█ Even assuming the existence of such a contract, we would uphold the trial court's grant of summary judgment as to plaintiffs' claim for tortious interference with an employment contract against defendant LeVeque, plaintiffs' former supervisor and president of defendant Tower Cellular. In *Contadino v. Tilow* (1990), 68 Ohio App.3d 463, 467, 589 N.E.2d 48, 50, the court noted that, under Ohio law:

" * * * [T]he right of noninterference in an employment relationship is limited. There are those whose position vis-à-vis the employee and the employer entitles them to intrude upon the employment relationship. See, *e.g., Pearse v. McDonald's Systems of Ohio, Inc.* (1975), 47 Ohio App.2d 20 [, 1 O.O.3d 164, 351 N.E.2d 788] * * *. In *Anderson v. Minter* (1972), 32 Ohio St.2d 207 [, 61 O.O.2d 447, 291 N.E.2d 457] * * * the Ohio Supreme Court held that the plaintiff could not bring an action for tortious interference against her former supervisor notwithstanding the allegation that he had maliciously induced her former employer to suspend her. The court observed:

" 'Causes of action have been recognized against "outsiders" for malicious interference with employment. *Johnson v. Aetna Life Ins. Co.* (1914), 158 Wis. 56 [, 147 N.W. 32] * * *. Where, however, the act complained of is within the scope of a defendant's duties, a cause of action in tort for monetary damages does not lie. Nor can liability be predicated simply upon the characterization of such conduct as malicious. [Citations omitted.]

" 'As stated in *Johnson v. Aetna Life Insurance Co., supra,* "Malice makes a bad case worse, but does not make wrong that which is lawful." ' *Anderson, supra,* at 214 [, 61 O.O.2d at 450, 291 N.E.2d at 461] * * *. See, also, *Fawcett v. G.C. Murphy & Co.* (1976), 46 Ohio St.2d 245 [, 75 O.O.2d 291, 348 N.E.2d 144] * * *.' "

Thus, while actions for intentional interference with an employment contract are cognizable against "outsiders" to the employment relationship, Ohio courts have been reluctant to recognize actions by employees against their supervisor made within the scope of the defendant's duties. See, *e.g.*, *Rayel v. Wackenhut Corp.* (June 8, 1995), Cuyahoga App. No. 67459, unreported, 1995 WL 350077 ("this court has unequivocally stated that, 'a supervisor of an employee cannot be held liable for tortious interference with contract.' * * * As such, appellant's claim involved a suit by a subordinate employee against a supervisor. Under the law of this district, no such action can lie."). Further, "Ohio courts have approved * * * 'the well-recognized privilege of officers, directors, officers, and creditors to interfere with contracts in the furtherance of their legitimate business interests * * *." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.* (C.A.6, 1988), 862 F.2d 597, 601.

As previously noted, LeVeque is the president (and sole shareholder) of Tower Cellular. We agree with defendants' contention that LeVeque was not an "outsider" or "third party" to plaintiffs' employment agreement with Tower Cellular, and we find that defendants were entitled to summary judgment, as a matter of law, on plaintiffs' claim for intentional interference with the contract.

■ Plaintiffs also contend that the trial court erred in granting summary judgment as to their claim for fraudulent misrepresentation. This cause of action appears to be based on alleged misrepresentations by LeVeque regarding future opportunities. Specifically, Daup testified that the false representations by LeVeque involved "the false promises that he made about my duration of employment with Tower." Daup stated that LeVeque misled him "to believe I was going to be with him and was his buddy."

■ The elements of fraud are: " 'a) a representation * * *, b) * * * material to the transaction at hand, c) made falsely, * * * d) with the intent of misleading another into relying upon it, e) justifiable reliance upon the representation * * *, and f) a resulting injury proximately caused by the reliance.' " *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 111, 570 N.E.2d 1095, quoting *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus.

In *Wing, supra,* the plaintiff argued that because he was offered a chance at equity participation in the future but was discharged before it occurred, the offer must have been a lie. The Ohio Supreme Court found that the trial court properly granted summary judgment in favor of the employer on this issue, holding that "the promise of future equity participation was not a promise of continued employment," and that the mere "possible inference of falsehood" was not evidence of falsehood. *Wing, supra,* at 111, 570 N.E.2d at 1099.

In the present case, we have previously concluded that plaintiffs failed to establish that they had an implied contract with Tower Cellular that altered their at-will employment status. We do not find, on the record before this court, that plaintiffs have shown the existence of genuine issues of material fact regarding false representations against defendants for continued employment.

Finally, plaintiffs assert that they are entitled to recover for unjust enrichment and quantum meruit based on defendants' failure to pay plaintiffs the residual and override payments.

In general, "[u]njust enrichment occurs when a party retains money or benefits that in justice and equity belong to another." *Holzman v. Fifth Third Bank, N.A.* (Apr. 30, 1999), Hamilton App. No. C–980546, unreported, 1999 WL 252715. Further, "[u]njust enrichment is a quasi-contractual theory that operates in the absence of an express contract or a contract implied in fact." *Id.*

We note that plaintiffs assert that their claim for post-termination residual and override payments is based on an alleged express agreement. Assuming the existence of such an agreement, the theory of quasi-contract or unjust enrichment would not be available. *Patterson v. Chesapeake* (Nov. 15, 1996), Lawrence App. No. 95CA19, unreported, 1996 WL 668831. However, in the present case, we have previously determined that there remain genuine issues of material fact as to whether defendants breached an agreement for post-termination residual and override payments. Therefore, upon remand, the trial court should initially address the issue regarding plaintiffs' claim for breach of an express contract regarding residual and override payments. Assuming, without deciding, that plaintiffs have a remedy under an express agreement, plaintiffs would be precluded from also seeking relief for unjust enrichment. Only in the event of a finding of no express agreement regarding plaintiffs' entitlement to overrides or residuals would the unjust enrichment claim be before the court. Accordingly, the issue of whether the court erred in granting summary judgment as to plaintiffs' quantum meruit claim is not yet properly before this court.

Based upon the foregoing, plaintiffs' single assignment of error is sustained in part and overruled in part. Accordingly, the judgment of the trial court granting summary judgment in favor of defendants is affirmed in part and reversed in part, and this matter is remanded to the trial court for further proceedings in accordance with law and consistent with this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

PEGGY BRYANT and BROWN, JJ., concur.