**NOT RECOMMENDED FOR PUBLICATION**
**File Name:  17a0146n.06**
**No. 16-3906**
**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 07, 2017
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| ANTHONY J. CASALE, M.D., | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| NATIONWIDE CHILDREN'S HOSPITAL, | ) |
| | ) |
| Defendant-Appellee. | ) |
| | ) |
| | ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

BEFORE:  SILER, MOORE, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Anthony Casale appeals the district court's order of summary judgment in favor of defendant Nationwide Children's Hospital (NCH) on his Ohio law contract and tort claims. Casale, a successful physician, alleges NCH persuaded him to leave a stable career in Kentucky for the promise of a prominent hospital leadership position, but "pulled the rug out from under him" and withdrew its offer before he started.  Like the district court, however, we must acknowledge "the law does not provide redress for every act of unfairness."  Finding no error requiring reversal, we affirm.

I.

In early 2010, with its Chief of Urology set to retire, NCH reached out to Dr. Anthony Casale to gauge his interest in running its urology program.  Initially, Casale was a reluctant

candidate. He already had "a pretty good job" as a tenured professor and acting Chair of the Department of Urology at the University of Louisville's School of Medicine, and he "intended to stay at the University of Louisville." Still, knowing his position as acting Chair remained "quite unsettled," plaintiff decided to pursue the offer. After two days of interviews, NCH's Chief Operating Officer, Dr. Rick Miller, informed Casale that NCH planned to make him an offer.

Defendant sent Casale a draft offer letter in late July. Miller emphasized the letter was just "the first offer." "[I]f it's something that's not adequate," he added, "I want you to come back and ask for it, and we'll probably meet it." Over the next few days, he and Casale discussed salary and bonuses. NCH proposed that Casale's annual bonus be tied to his productivity, including the number of patients he treated. Casale recognized it would take him time to build his practice as a doctor new to the Columbus area, and instead asked that NCH guarantee his bonus for the first two years of employment. NCH agreed. It also agreed to plaintiff's request for "academic support," including funding for educational conferences and research.

In its final form, the offer letter included no express durational term, or limit on defendant's ability to terminate Casale's employment—a topic plaintiff acknowledged he did not discuss with Miller. Casale was also free to terminate his employment under the agreement, provided he repay his signing bonus and relocation expenses "if for some reason [he] decided to leave NCH prior to eighteen months of service." Plaintiff signed the offer letter and faxed it to NCH on August 4, 2010.

Shortly after Casale's acceptance, NCH sent him an information packet regarding its medical staff credentialing procedure and instructions for obtaining an Ohio medical license. Casale's offer letter specified his employment was "contingent upon verifying [his] Ohio

medical license and obtaining and maintaining medical staff privileges at NCH." The packet warned that securing a license and staff credentialing was a "lengthy" process which could take 10 to 12 weeks to complete. Given his January 1, 2011, start date, Casale understood he had limited time to submit his application materials.

Yet by early December, plaintiff was neither licensed to practice in Ohio, nor credentialed as an NCH medical staff member. The parties "vigorously dispute[d]" the cause of the delay before the district court, and dispute it further on appeal. Defendant faults Casale for failing to submit complete application materials in a timely manner. Plaintiff maintains he did "everything within his power" to provide the necessary information, and instead pins the blame on Pam Edson—an NCH employee whose assistance with the process was "so inadequate" and "erroneous[]," it resulted in "[m]onths of licensing delay." Whatever the cause, defendant told Casale it could not "employ [him] until [his] licensure and credentialing is complete," and delayed his start date until February 1, 2011.

Meanwhile, plaintiff's former colleague Dr. Stephen Wright sent NCH a peer review reference to be considered as part of the credentialing process. Karen Allen, a member of NCH's medical staff services team, flagged the review as "very poor" and forwarded it to Drs. Brilli (NCH's Chief Medical Officer), Teich (NCH's Staff President), and Rothermel (Chair of NCH's credentials committee). Plaintiff contends the disclosure of this information outside the credentialing process violated Ohio's peer review confidentiality restrictions. *See* Ohio Rev. Code § 2305.251–52. He also suspects that NCH improperly relied on the reference in withdrawing its offer of employment, and suggests Allen's characterization of Dr. Wright's comments "poison[ed] the well" against him. "In my opinion," Allen wrote in an email to Rothermel, "there is no way we should hire this man!!"

Casale also attended two meetings at NCH in late 2010—one to assist with his licensing and credentialing applications, and another to meet with future NCH colleagues. At the first, plaintiff met with NCH employees Kelly Wheatley and Julie Zaremski. Both employees described the meeting as uncomfortable and unproductive; plaintiff appeared "visibly frustrated" and did not answer their questions concerning certain "holes" and "discrepanc[ies]" in his work history. Plaintiff agreed the meeting was "a negative experience for everyone," but attributed this to Wheatley and Zaremski, who "had no experience" with NCH's credentialing process. At the second meeting, plaintiff spoke with some of NCH's surgeons, including those "who might refer [patients] to him." Upon leaving, Casale purportedly told another NCH staff member "this is a waste of my time." Plaintiff admits he made this statement, but says NCH takes his remark out of context: "I told her it was a waste of what time we had at that point."

After the meetings, Miller had second thoughts about plaintiff. Casale had been "somewhat ambivalent" about joining NCH from the beginning. Plaintiff seemed more "focus[ed] on his issues in Louisville" than on his license and credential paperwork, which he took roughly three months to complete, resulting in a delayed start. Then, when he arrived for meetings at NCH, Casale had difficulty connecting with defendant's staff. One employee assigned to help with his credentials described their interaction "as the most difficult meeting she has ever had with a physician." "Any one of these [issues] we'd probably ignore," Miller observed, "but in aggregate, they are perhaps very concerning."

Ultimately, NCH asked plaintiff to withdraw his acceptance. Casale refused. Having "given up everything in Louisville in order to keep [his] commitment to NCH," he requested an in-person meeting with Miller to resolve NCH's concerns. NCH declined his request and

formally withdrew its offer of employment. Thereafter, the University of Louisville accepted Casale back onto its faculty as acting Chair of Urology, but with a lower salary and no tenure.

## II.

Casale filed suit against NCH in 2011, alleging its actions cost him significant damages and impaired his future employment prospects. After the district court granted its motion to dismiss two of plaintiff's claims, NCH moved for summary judgment on the remaining five: breach of express contract, breach of implied contract, anticipatory repudiation, promissory estoppel, and defamation. While it acknowledged defendant had treated plaintiff "quite shabbily," the district court granted the motion.

Casale timely appeals.[1] He also moves to supplement the record on appeal, while NCH moves to strike "certain portions" of plaintiff's brief.

## III.

We review the district court's grant of summary judgment de novo. *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict in favor of the nonmovant, and a fact "material" if it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Viewing the evidence in a light most favorable to the nonmoving party, our task is to determine "whether the evidence presents a sufficient disagreement to require

---

[1]Plaintiff also appealed a subsequent order denying his motion to alter or amend the judgment, but waived the issue by failing to address the order in his brief. *See White Oak Prop. Dev., LLC v. Washington Twp.*, 606 F.3d 842, 854 (6th Cir. 2010) ("Issues not raised in appellate briefs are deemed waived.") (citation and brackets omitted).

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

A.

Ohio recognizes the doctrine of at-will employment, meaning the "relationship between employer and employee is terminable at the will of either" and "an employee is subject to discharge by an employer at any time, even without cause." *Wright v. Honda of Am. Mfg., Inc.*, 653 N.E.2d 381, 384 (Ohio 1995). It also recognizes two exceptions tempering the general at-will rule: (1) the existence of an express or implied contract altering the terms of discharge; and (2) promissory estoppel, where the employer makes representations or promises of continued employment. *Id.*; *see also Clark v. Collins Bus Corp.*, 736 N.E.2d 970, 973 (Ohio Ct. App. 2000) (citing *Mers v. Dispatch Printing Co.*, 483 N.E.2d 150, 154–55 (Ohio 1985)). Plaintiff here relies on both, asserting claims for breach of express or implied contract, anticipatory repudiation, and promissory estoppel. Neither party disputes the district court's finding that the offer letter between plaintiff and NCH is a "valid contract" for employment; the only question is whether it guarantees employment for a specific term.

For an individual hired under contract, "there is a strong presumption of at-will employment, unless the terms of the agreement clearly indicate otherwise." *Padula v. Wagner*, 37 N.E.3d 799, 808 (Ohio 2015). On its face, the offer letter does not rebut that presumption. It includes no express durational term and no limit on either party's ability to terminate the relationship.[2] And "[w]here a contract of employment does not state the duration of employment, employment is considered to be at will." *Clark*, 736 N.E.2d at 973.

---

[2]Requiring an employee to repay relocation expenses if he resigns within the first eighteen months of employment does not alter his right to terminate the relationship at will. *See, e.g.*, *Clark*, 736 N.E.2d at 972–73.

Still, Casale insists several of the letter's provisions demonstrate an express agreement for an initial term of three years' employment, renewable at his option thereafter. For instance, the letter lists Casale's salary for his initial three years of employment, and guarantees his bonus for the first two years, until he can "build clinical volumes" and earn a bonus based on productivity. Plaintiff is eligible for further salary increases after the first three years, and his pension does not fully vest until after five years. NCH also commits to a million dollar "research start up package" payable "over a three[-]year period," agrees to fund "two urology fellowships (one new fellow per year)," and pledges support for "three educational events per year." Yet, the district court was unconvinced; it concluded "[n]one of the contractual terms Plaintiff relies on raise a genuine issue of material fact as to the duration of the contract." We agree.

"In the absence of facts and circumstances which indicate that the agreement is for a specific term, an employment contract which provides for an annual rate of compensation, but makes no provision as to the duration of the employment, is not a contract for one year, but is terminable at will by either party." *Henkel v. Educ. Research Council of Am.*, 344 N.E.2d 118, 118 (Syllabus by the Court) (Ohio 1976). Plaintiff agrees "[t]he simple statement of an annual rate, without more [i]s not enough . . . to constitute an express term of duration" under *Henkel*. "However," he continues, "it *was* enough" under the Ohio Supreme Court's decision in *Kelly*, "where the letter agreement also provided for a monthly amount, a settling up at year-end, and a guaranteed gross sum every year." Appellant's Br., at 33 (citing *Kelly v. Carthage Wheel Co.*, 57 N.E. 984 (Ohio 1900)). Casale argues the additional terms here—the guaranteed bonuses, potential future raises, and academic support—go further than the "settling up" in *Kelly* to prove NCH's intent to employ him for a specific term. He is incorrect. Ohio's Supreme Court rejected this same reading of *Kelly* in *Henkel*: "Our decision in *Kelly* does not resolve the issue . . . [of]

whether a hiring at a specified sum per year constitutes a hiring for a year." 344 N.E.2d at 121. "The court merely held that because Kelly had initially been hired for one year, absent a new arrangement at the end of that year, he was rehired upon identical terms for a second year." *Id.*

Neither the statement of an annual rate of pay, *Henkel*, 344 N.E.2d at 118, nor the promise of "career advancement opportunities," *Daup v. Tower Cellular*, 737 N.E.2d 128, 133 (Ohio Ct. App. 2000) (citation omitted), such as bonuses and academic funding, modify the presumed at-will relationship. *See id.* at 133–34 (promises to develop "many other ventures together" insufficient to alter at-will employment); *Clark*, 736 N.E.2d at 972–73 (employment contract specifying annual salary and bonus with no mention of duration is an at-will contract); *Shaw v. J. Pollock & Co.*, 612 N.E.2d 1295, 1298 (Ohio Ct. App. 1992) ("The potential of future profitsharing is not a fact or circumstance which transforms a contract terminable at will into a contract for a term of years."). This is so because, as the district court explained, provisions concerning bonuses, raises, and research funding per year ultimately suffer from the same defect as provisions concerning annual compensation: they "refer to how much NCH will support *per year*; they say nothing to guarantee employment for a specific duration."

"The general rule in Ohio is that unless otherwise agreed to by the parties, an employment agreement purporting to be permanent or for life, or for no fixed time period is considered to be employment terminable at the will of either party." *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1040 (6th Cir. 1992) (citing *Henkel*, 344 N.E.2d at 118). Because the offer letter does not "clearly indicate" a specific term of employment, plaintiff has failed to rebut the "strong presumption" in favor of an at-will relationship. *Padula*, 37 N.E.3d at 808. NCH's withdrawal of the employment offer was therefore not a breach of an express contract.

B.

While failure to specify duration in the offer letter may be fatal to a claim for breach of express contract, the same cannot be said of a claim for breach of implied contract. *See, e.g.*, *Wright*, 653 N.E.2d at 384. Contractual limits on an employer's right to discharge an employee need not be in writing; they can also be implied from "the 'facts and circumstances' surrounding the employment-at-will relationship." *Id.* (quoting *Mers*, 483 N.E.2d at 154). "These facts and circumstances include the character of the employment, custom, the course of dealing between the parties, company policy," oral representations, and "any other fact which may illuminate the question." *Id.* (internal quotation marks omitted).

Plaintiff argues that even if NCH did not expressly promise him a specific term of employment, the facts and circumstances here nevertheless support the finding of an implied contract for a specific term of employment. In this regard, Casale compares his case to *Miller v. Lindsay-Green, Inc.*, No. 04AP-848, 2005 WL 3220215 (Ohio Ct. App. Dec. 1, 2005), and *Wright*, 653 N.E.2d 381. Neither comparison is apt.

*Miller* involved an employee who claimed his employer made an oral promise to employ him for a ten-year period. *Miller*, 2005 WL 3220215 at *1, *4. Plaintiff cites *Miller* for the proposition that parol evidence, such as oral promises of employment, can supplement a written agreement which is silent as to duration in order to establish an implied promise of a specific term of employment. But the oral promise in *Miller* did not support a breach-of-contract claim. It supported a promissory estoppel claim.[3] *Id.* at *4–6, *8. The distinction is significant,

---

[3]Miller succeeded on a separate breach-of-contract claim premised on a written "Terms of Acceptance" agreement. *Miller*, 2005 WL 3220215 at *1–2, *4. He alleged the defendant breached the "Terms of Acceptance" agreement *not* by terminating him before the end of the ten-year term, but for failing to pay the "year-end bonus and other compensation" he had earned under the agreement. *Id.*, *4–5.

because "[p]romissory estoppel . . . is not a contractual theory but a quasi-contractual or equitable doctrine designed to prevent the harm resulting from [an employee's] reasonable and detrimental reliance . . . upon the false representations of his employer." *Karnes v. Doctors Hosp.*, 555 N.E.2d 280, 283 (Ohio 1990) (per curiam); *see also Dunn v. Bruzzese*, 874 N.E.2d 1221, 1228–29 (Ohio Ct. App. 2007) (distinguishing promissory estoppel as a "tool of equity" or contract implied-in-law, from a contract implied-in-fact). A claimant proceeding on a theory of promissory estoppel can, for instance, prevail without demonstrating a "meeting of the minds" between the parties. *Dunn*, 874 N.E.2d at 1228–29 (citation omitted).

But a claimant proceeding on a theory of an implied-in-fact contract cannot. *Id.* "On the contrary, the existence of . . . [an] implied-in-fact contract[] . . . hinge[s] upon proof of all the elements of a contract." *Id.* at 1228 (citation omitted). "To establish a contract implied in fact, a plaintiff must demonstrate that the circumstances surrounding the parties' transaction make it reasonably certain that an agreement was intended." *Id.* at 1228–29 (citation omitted).

The employee in *Wright*, who was hired without a written agreement, made that showing. Honda terminated Wright for violating its anti-nepotism policy, but she presented evidence demonstrating "that an implied employment agreement existed [under] which [she] could not be terminated unless she failed to perform her job adequately." 653 N.E.2d at 384. Honda's employee handbook, progress reports, and promotional letters emphasized the plaintiff's "continued growth" with the company, and her supervisor testified "that if an employee performs his . . . job in an acceptable manner," he can "expect to have continued employment with Honda." *Id.* "Once [Wright] became aware of [the anti-nepotism] policy," management at first informed her "that she had no reason to be concerned and that there were other employees who retained their positions under similar circumstances." *Id.* at 385. Despite these assurances,

Wright's supervisor sent her home from work to "investigate" the policy violation, then invited

Wright back "as if nothing had happened," only to terminate her a month later. *Id.* at 383, 385.

These "[p]articularly egregious" circumstances did not befall Casale. *Id.* at 385. Plaintiff

acknowledged he and Miller had no discussions "regarding the circumstances under which [his]

employment with [NCH] could be terminated." Unlike in *Wright*, plaintiff points to no

handbook, progress reports, or statements by management suggesting "that if an employee

performs his . . . job in an acceptable manner," he can "expect to have continued employment" at

NCH. *See id.* at 384. Further, the circumstances plaintiff does identify are unrelated to

duration.[4] For instance, plaintiff notes that NCH introduced him in internal emails, letters to

staff, and marketing materials as its "new Chief of Urology." He also complains that NCH

required him to undergo extensive "pre-employment onboarding," such as attending meetings

and obtaining his Ohio medical license and staff credentials. These circumstances prove only the

undisputed fact that defendant hired plaintiff—not that it intended to limit its ability to terminate

him.

Finally, plaintiff argues that to accept NCH's offer, he left a secure, lucrative position at

the University of Louisville, one he would not have abandoned if he understood defendant was

offering only at-will employment. Here again, Casale confuses facts that may support the

---

[4]Instead of designating particular facts and circumstances that may create an implied contract, plaintiff directs us broadly to the "Statement of the Case" section of his brief, which includes both relevant and irrelevant information. Plaintiff points out, for instance, that NCH included an "at-will" clause in its contract with another physician, Dr. Corey Raffel, but did not include one in plaintiff's offer letter. If the appeal at hand concerned Dr. Raffel's employment, this fact would be relevant. But it does not. *See also Alexander v. Columbus State Cmty. Coll.*, 35 N.E.3d 949, 956 (Ohio 2015) (lack of an at-will disclaimer should "be considered," but "does not change the presumption that, unless otherwise stated, an employee is terminable at will"). Plaintiff also notes NCH guaranteed his bonus for the first two years, as he requested. This shows a meeting of the minds regarding the payment of bonuses, not the duration of employment.

finding of an equitable remedy, such as promissory estoppel, with facts necessary to demonstrate an implied-in-fact contract. *See Dunn*, 874 N.E.2d at 1228–29; *see also Clark*, 736 N.E.2d at 973 (no anticipatory repudiation where the at-will plaintiff "made [the] necessary arrangements to leave his former employer, move to the new employer's city, and pursue his job duties," and the defendant withdrew its employment offer before he started). As the district court put it, plaintiff's "citation to his own testimony that he would not have accepted an at-will offer or that another chief was given a contract with a term of five years does nothing to assist a trier of fact in determining whether *both parties to this agreement* mutually assented to a guaranteed period of employment of three years."

Because plaintiff has failed to demonstrate an express or implied contract for a specific term of employment, the district court did not err in granting defendant summary judgment on his claims for breach of contract and anticipatory repudiation.

C.

Invoking equitable remedies more directly, plaintiff also alleged a claim of promissory estoppel. To prevail on this claim, Casale must show: (1) a clear and unambiguous promise on the part of NCH; (2) his reliance on the promise; (3) that the reliance was reasonable and foreseeable; and (4) that he was injured as a result of his reliance. *Dunn*, 874 N.E.2d at 1227. Although plaintiff's willingness to "giv[e] up his . . . secure employment in reliance upon [NCH's] representations" may well establish the second element, *see Patrick v. Painesville Commercial Props., Inc.*, 650 N.E.2d 927, 931 (Ohio Ct. App. 1994), the district court found Casale failed at the first, having cited no evidence "of any promise of employment for a specific term." Casale argues this decision was in error, because Ohio does not require that a promise for continued employment be "for a specific term."

Plaintiff misinterprets the district court's holding. As explained in its order denying plaintiff's motion to alter or amend the judgment, the court used the phrase "specific term of employment" merely to "repeat[] Plaintiff's theory of the case, not [to] stat[e] that Ohio law requires a promise of a specific term." "Elsewhere, the Court phrased the standard as whether there had been a detrimental reliance on a 'specific promise of job security,' and noted that Plaintiff failed to cite any evidence of a 'specific promise.'"

This was the reason the district court granted defendant summary judgment on Casale's promissory estoppel claim—because plaintiff failed to identify the "clear and unambiguous promise" upon which he relied. *Shaw*, 612 N.E.2d at 1298. And the court was right to require that the promise be specific. "[V]ague, indefinite promises of future employment or mere representations of future conduct without more specificity do not form a valid basis for the application of the doctrine of promissory estoppel." *Daup*, 737 N.E.2d at 134 (internal quotation marks omitted). Likewise, "[i]n the absence of a specific promise of continued employment, a promise of future benefits or opportunities does not support a promissory estoppel exception to the employment-at-will doctrine." *Clark*, 736 N.E.2d at 974 (internal quotation marks omitted).

Plaintiff now argues he demonstrated a specific promise of employment for "a minimum three-year term, renewable by him, through age 70," based on the offer letter, and a discussion he had with Miller about working to age 70 before signing it. However, Casale did not press either point below, and "the failure to present an issue to the district court forfeits the right to have that argument addressed on appeal." *600 Marshall Entm't Concepts, LLC v. City of Memphis*, 705 F.3d 576, 585 (6th Cir. 2013) (citation omitted). "Our function is to review the case presented to the district court," not "a better case fashioned after a district court's unfavorable order." *Id.* (citation omitted). And the result in this case would be no different if we did. The offer letter

includes no specific promise of employment for any term, and "promissory estoppel does not apply to oral statements made prior to the written contract where the contract covers the same subject matter." *Clark*, 736 N.E.2d at 974 (citation and brackets omitted). Accordingly, the district court did not err in granting summary judgment on plaintiff's promissory estoppel claim.

D.

Plaintiff next argues the district court erred in rejecting his claim for wrongful discharge in violation of public policy. We disagree.

Ohio recognizes a tort action for wrongful discharge in violation of public policy as another exception to the at-will rule. *McGowan v. Medpace, Inc.*, 42 N.E.3d 256, 260–61 (Ohio 2015). To succeed on this claim, an employee must show, among other elements, "that a clear public policy existed," and that his termination "jeopardized th[at] public policy." *Id.*

According to plaintiff, the "clear public policy" at issue here is expressed in Ohio Revised Code § 2305.252, a statute detailing the extent to which materials from a peer review proceeding may be introduced in a civil action against a hospital or health care provider. He alleges NCH violated this statute when Karen Allen circulated Dr. Wright's peer review reference to NCH decisionmakers outside of the credentialing process, who then considered it in withdrawing his employment offer. The district court rejected plaintiff's argument, not because he failed to demonstrate NCH's misuse of the information, but because § 2305.252(A) does not establish "a clear public policy against using peer review references as the basis for making hiring or firing decisions with respect to the subject of the reference."

However, we need not determine whether this ruling is correct because plaintiff's wrongful termination claim fails for another reason; he never pleaded it. Plaintiff asserted this cause of action for the first time in his brief opposing summary judgment. A nonmovant may not

advance new claims in response to a motion for summary judgment or on appeal. *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). "To permit a plaintiff to do otherwise would subject defendants to unfair surprise." *Tucker v. Union of Needletrades, Indus. and Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). Regardless of the merits, the district court did not err in rejecting plaintiff's wrongful discharge claim.

E.

Finally, plaintiff challenges the district court's grant of summary judgment on his defamation claim. "Defamation is a false statement published by a defendant with some degree of fault, reflecting injuriously on a person's reputation . . . or affecting a person adversely in his or her trade, business or profession." *Gilson v. Am. Inst. of Alt. Med.*, 62 N.E.3d 754, 769–70 (Ohio Ct. App. 2016) (internal quotation marks omitted). To establish defamation, a plaintiff must show: (1) the defendant made a false and defamatory statement concerning the plaintiff; (2) which was published; (3) injuring the plaintiff; and (4) that the defendant acted with the requisite degree of fault. *Id.*

Casale argues defendant withdrew its employment offer due in part to false statements by its employees, including Karen Allen's email concerning Dr. Wright's "very poor" peer review reference, her "opinion" that "there is no way we should hire this man," Dr. Miller's report that Casale had referred to an NCH meeting as "a waste of time," and his statement that an employee described her interaction with Casale as "the most difficult meeting she has ever had with a physician." Yet, when it came to proving that these statements were defamatory before the district court, plaintiff limited his argument to a single sentence: "The factors in *Gosden v. Louis*, [687 N.E.2d 481, 488 (Ohio Ct. App. 1996)]," i.e., the elements of defamation, "are satisfied."

Proffer of a "vague, one-sentence" argument before the district court does not preserve an issue for appeal. *Berera v. Mesa Med. Group, PLLC*, 779 F.3d 352, 361 (6th Cir. 2015) (brackets and citation omitted). Moreover, the "better case" Casale has "fashioned after [the] district court's unfavorable order" does not advance his claim. *600 Marshall Entm't Concepts*, 705 F.3d at 585 (citation omitted). Allen's statements are protected opinions. *See Byrne v. Univ. Hosps.*, No. 95971, 2011 WL 3630483, *4 (Ohio Ct. App. Aug. 18, 2011) ("A recommendation not to rehire is just that, a recommendation based on . . . subjective opinion."). And Miller's statements are substantially true—Casale acknowledged that he referred to an NCH meeting as a "waste of . . . time," and a staff member did indeed report him as "the most difficult of all of the physicians [she] had dealt with." *See Sweitzer v. Outlet Commc'ns, Inc.*, 726 N.E.2d 1084, 1090 (Ohio Ct. App. 1999) (Defamation is defeated where "the gist, or imputation, of the statement is substantially true"). Neither NCH employee defamed plaintiff.

Casale also argues the district court erred in rejecting his theory of forced republication. "The forced republication doctrine provides for proof of publication where a defamed person is forced to republish defamatory statements to a third party, such as a person who is required to state the reason for leaving his or her former employer when completing an application for employment." *O'Malley v. NaphCare, Inc.*, 101 F. Supp. 3d 742, 752 n.4 (S.D. Ohio 2014) (internal quotation marks omitted). "It is not clear whether Ohio courts have embraced the idea that an alleged victim of defamation can satisfy the publication element . . . by publishing [a statement] himself." *Id.* (internal quotation marks omitted). But to the extent they have, the idea does not benefit Casale. A forced republication plaintiff must still identify what he was forced to republish, and Casale does not. "In the case before us, there was no allegation in the pleadings, nor was there any averment in connection with the motion for summary judgment, to the effect

that the defamatory statement was ever, in fact, republished to a [prospective employer]." *Atkinson v. Stop-N-Go Foods, Inc.*, 614 N.E.2d 784, 786 (Ohio Ct. App. 1992). "Without republication to a third person, the 'forced republication' doctrine can have no application." *Id.*

IV.

For the foregoing reasons, we affirm the district court's judgment, and deny the pending motions to strike and to supplement the record as moot.