OPINION
{¶ 1} Barbara L. Temple appeals from a judgment of the Montgomery County Court of Common Pleas, which denied her motion for summary judgment against the City of Dayton and various city officials and employees, and granted the defendants' motions for summary judgment.
 {¶ 2} The following facts are undisputed.
 {¶ 3} Temple was hired by the Dayton Police Department in 1973, and she gradually moved up through the ranks after successfully meeting the civil service requirements, including competitive testing. On August 6, 1998, Temple was appointed to Major and given responsibility for the Professional Standards Division. In September of 1998, the Chief of Police announced a reorganization that would split operations into two zones, one north (Green Division) and one south (Blue Division). At this time, Temple was assigned to the Administrative Services Division. On May 24, 1999, she was appointed to head the Green Zone.
 {¶ 4} Around June or July 2000, the Chief of Police retired and John Thomas stepped in as acting Chief of Police. In the Fall of 2000, the City of Dayton began to determine the criteria for selecting a new Chief of Police, and a job announcement was subsequently issued. On May 31, 2001, Temple submitted her application and resume for the open Chief of Police position.
 {¶ 5} In July of 2001, Temple was informed that she was one of seven finalists selected to be interviewed for the Chief position. Interviews were held in August 2001, after which three finalists were selected; Temple was not chosen as a finalist. At this time Temple as well as other members of the Command Staff were advised that the new Chief would be able to "pick his own team," and they were encouraged to investigate other opportunities for employment. Before the conclusion of the selection process, the three Chief finalists participated in meetings with the Command Staff members, including Temple. At the meeting between the Command Staff and candidate William McManus, McManus stated that he did not intend to "whack" anyone so long as the work was being performed satisfactorily. McManus was ultimately chosen as the new Police Chief. McManus began working in November 2001, although he had not yet been formally sworn into office.
 {¶ 6} On December 4, 2001, Temple had an employment evaluation with Colonel Compston. Although Compston indicated that he would recommend a 4.5% pay increase, Temple received an increase of 1.5%. Temple filed a complaint, and she eventually received a 4.5% raise. On December 21, 2001, Temple received a reprimand for neglect of duty based on the scheduling of officers. Temple alleges that this reprimand was unjust. Soon thereafter, McManus was sworn in as Chief of Police.
 {¶ 7} On February 7, 2002, Temple was issued a traffic citation for an on duty accident that occurred on January 8, 2002. In April 2002, Temple was issued a reprimand for Dereliction of Duty based on an alleged delay in setting up a meeting with a citizen. Temple states that the delay was less than a week and that this reprimand was also unjust.
 {¶ 8} On April 22, 2002, Chief McManus held a meeting with Temple during which he told Temple that he wanted her to retire. He further stated that, if she did not do so voluntarily, she would be placed on administrative leave and then terminated. Temple states that McManus did not indicate that she had done anything wrong but that he was "putting together my team and you're not on it." McManus requested that Temple provide a letter of intent to retire. The following morning, Chief McManus announced Temple's retirement to the media. Temple was again asked to supply a letter of intent to retire; Temple responded that she had no intentions of retiring. On May 24, 2002, Temple was called to the office of Mattie Seege, the Acting Assistant City Manager. When she arrived, City of Dayton Attorney Brent MacKenzie was also present. Temple was given a letter stating that she was on administrative leave, effective immediately, and that she would be terminated from the City payroll on June 30, 2002. Temple's employment with the City of Dayton was terminated on June 30, 2002.
 {¶ 9} Temple appealed her termination to the Civil Service Board. On July 17, 2002, the Board cancelled her hearing date and denied her appeal on the ground that she was an unclassified employee. Temple also filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). She alleged that she was denied equal wages because of her sex and that she was discharged because of her sex and in retaliation for complaining about unequal wages.
 {¶ 10} On July 24, 2002, Temple filed a twenty-six count verified complaint against the City of Dayton and various city officials and employees (collectively, "the City").[1] She claimed that she had been wrongfully denied a hearing by the Civil Service Board, that the defendants had breached the City Charter and her employment contract, and that the defendants had violated her right to due process and equal protection. She also brought claims of estoppel, duress, coercion, discrimination, misrepresentation, fraud, breach of fiduciary duty, bad faith, conspiracy, violation of public policy, tortious interference with employment rights and benefits, infliction of emotional distress, defamation, invasion of privacy, and loss of consortium. In addition, Temple and her daughters brought claims as taxpayers and sought mandamus relief. As acknowledged by Temple, "the crux of the allegations are predicated upon Dayton's failure to follow or adhere to well settled civil service principles."
 {¶ 11} On December 4, 2002, Temple filed a motion for summary judgment. In that motion, she argued that she was a classified employee as defined by the Dayton City Charter and that the Charter was unconstitutional, because it allows an unclassified employee to be discharged without any review. Temple further argued that she had been denied equal protection by the Charter's division of employees into unclassified and classified categories and denied due process, in violation of Section 100 of the Charter, in that she was not provided with a pre-termination hearing nor the reasons for her discharge. Temple claimed that her discharge was in violation of public policy. The City responded that Temple was an unclassified employee under the Dayton City Charter, that the Charter was constitutional, that her rights had not been violated, and that it was entitled to summary judgment on those claims.
 {¶ 12} On May 1, 2003, the City filed a motion for summary judgment on the claims not addressed by Temple's prior summary judgment motion. Temple opposed that motion. In addition, she filed a request for judicial notice and a motion to apply res judicata or collateral estoppel to a decision of the Equal Employment Opportunity Commission on Temple's administrative discrimination charge. On October 7, 2003, the trial court overruled Temple's motion for summary judgment and granted the City's cross-motion for summary judgment and its May 1, 2003, motion for summary judgment.
 {¶ 13} On appeal, Temple raises five assignments of error, which we will address in an order that facilitates our analysis. At the outset, we note that Temple has not challenged the trial court's rulings on her claims regarding the constitutionality of the Dayton City Charter, breach of contract, equal protection, due process, jurisdiction under R.C. 2506.01, invasion of privacy, civil conspiracy, defamation, intentional infliction of emotional distress, employer intentional tort, tortious interference with a business relationship, duress, breach of fiduciary duty, loss of consortium, request for mandamus, and taxpayer suit.
 {¶ 14} Our review of the trial court's decision to grant summary judgment is de novo. See Helton v. Scioto Cty. Bd. ofCommrs. (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. See Stateex rel. Grady v. State Emp. Relations Bd., 78 Ohio St.3d 181,183, 1997-Ohio-221, 677 N.E.2d 343; Harless v. Willis DayWarehousing Co. (1978), 54 Ohio St.2d 64, 65-66, 8 O.O.3d 73,375 N.E.2d 46.
 {¶ 15} "I. The trial court erred by granting summary judgment to defendants-appellees while discovery was ongoing."
 {¶ 16} In her first assignment of error, Temple claims that the trial court should not have ruled on the motions for summary judgment while discovery was still proceeding. Although Temple acknowledges that we have required parties to request time to complete discovery before the trial court rules on a summary judgment motion, she asserts the court had actual notice that she required additional discovery. She states that, in August 2003, she had filed notices in the trial court that she would be taking the depositions of seven witnesses in October 2003.
 {¶ 17} Civ.R. 56(F) provides: "Should it appear from the affidavits of a party opposing the motion for summary judgment that the party cannot for sufficient reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as is just." A motion under Civ.R. 56(F) must be supported by an affidavit containing "sufficient reasons why (the nonmoving party) cannot present by affidavit facts sufficient to justify its opposition" to the summary judgment motion. Doriott v. MVHE, Inc., Montgomery App. No. 20040, 2004-Ohio-867.
 {¶ 18} We have consistently held that "[p]arties who find themselves in a position of having to respond to a motion for summary judgment before adequate discovery has been completed must seek their remedy through Civ. R. 56(F). A party who fails to seek such relief does not preserve his right to challenge the adequacy of discovery upon appeal." Security Natl. Bank andTrust Co. v. Jones (July 6, 2001), Clark App. No. 2000-CA-59; see Clark Cty. Solid Waste Mgt. Dist. v. Danis Clarkco LandfillCo. (1996), 109 Ohio App.3d 19, 36, 671 N.E.2d 1034; Maschariv. Tone, 103 Ohio St.3d 411, 414, 2004-Ohio-5342, 816 N.E.2d 579
(upholding a grant of summary judgment prior to the completion of discovery where the non-moving party failed to file a motion under Civ.R. 56(F), where she only claimed that discovery was necessary to prepare for trial — not to respond to the motion, and where she did not schedule the depositions until after the deadline for responding to the summary judgment motion).
 {¶ 19} In the present case, Temple gave no indication that she could not fully defend against the City's motions for summary judgment without additional discovery. To the contrary, Temple provided several affidavits and documentary evidence in support of her motion and in opposition to the City's motions for summary judgment. Temple did not, at any point, avail herself of Civ.R. 56(F) and seek a delay of the trial court's ruling on the summary judgment motions. In addition, there is no indication that Temple sought to depose key witnesses until August 25, 2003, at which time the motions were fully briefed.[2] Thus, even though Temple filed notices of depositions soon before the trial court ruled in the pending summary judgment motions, the court was not informed, in accordance with Civ.R. 56(F), that additional discovery was necessary in order to respond fully to the City's summary judgment motions. Even if the trial court was actually aware of the notices, the court could have reasonably assumed that the depositions were scheduled for the sole purpose of trial preparation. Accordingly, the trial court did not abuse its discretion in ruling upon the pending summary judgment motions prior to the completion of discovery.
 {¶ 20} The first assignment of error is overruled.
 {¶ 21} "III. The trial court erred by finding that plaintiff-appellant barbara temple was an unclassified public employee."
 {¶ 22} In her third assignment of error, Temple claims that the trial court erroneously concluded that she was an unclassified public employee under the Dayton City Charter. With regard to this issue, the trial court stated:
 {¶ 23} "Plaintiff heavily weights her case on the assertion that she is or should be categorized as a classified employee. Plaintiff's position at the time of her termination was Head of the Green Division Zone of Operations. The City of Dayton Charter, Section 95(1)(C) specifically provides that the unclassified service includes `The heads of departments andheads of divisions of departments and members of appointive boards.' (Emphasis added.) The Green Division is a division of the Department of Police. As head of a division, Green, of a department, Police, Plaintiff was clearly an unclassified employee."
 {¶ 24} Temple contends that under the Charter, as originally drafted, the Chief of Police was the only unclassified public employee. She states that, at that time, the police department was a "division" of the Department of Public Safety. She argues that this intention still remains. Temple further cites to the deposition testimony of former Dayton City Manager Valerie Lemmie, who allegedly stated in another case that the Chief of Police is not a "department head" but, rather, a "division head." Because Lemmie's deposition was not before the trial court, it will not be considered. Parenthetically, even if we were to consider the cited testimony, Temple has not provided sufficient portions of the transcript to provide a context for Lemmie's statements, and it is not at all clear that she is discussing which positions are unclassified under the Dayton City Charter.
 {¶ 25} The Dayton City Charter was adopted by the City in 1913. Under the original Charter, five administrative departments were established: Department of Law, Department of Public Service, Department of Public Welfare, Department of Public Safety, and Department of Finance. Dayton City Charter § 51. Police functions were a division of the Department of Public Safety. Id. at § 70. However, the Charter authorized the City Commission to "discontinue any department and determine, combine, and distribute the functions and duties of departments and subdivisions thereof" by ordinance. Id. at § 52.
 {¶ 26} The Charter also established a Civil Service, in which City employees were divided into two classifications — unclassified and classified. Section 95(1) provided that the unclassified service shall include:
 {¶ 27} "A. All officers elected by the people."
 {¶ 28} "B. The City Manager."
 {¶ 29} "C. The heads of departments and heads of divisions of departments and members of appointive boards."
 {¶ 30} "D. The deputies and secretaries of the Manager and one assistant or deputy, and one secretary for each department, and the Clerk of the Commission."
 {¶ 31} Under the Charter, the classified service includes "all positions not specifically included by this charter in the unclassified service." Id. at § 95(2).
 {¶ 32} On November 30, 1966, the City of Dayton determined that "it would be to the City's advantage to elevate the Division of Police and the Division of Fire to Departmental status" and thereby created the Department of Police, which included two divisions: Division of Operations and Division of Administration. Dayton Ordinance No. 22320. Under that ordinance, the Department of Police would be managed by the Director of Police, also known as the Chief of Police. The Police Department has been reorganized numerous times since 1966. Most notably, in 1998, the City Commission created the Community Policing Field Services Green Division and Community Policing Field Services Blue Division within the Police Department. The new organization also included the Divisions of Administrative Services, Human Rehabilitation, Professional Standards, Special Investigations, and Security Services. Dayton Ordinance 29611-98. The Community Policing Field Services Blue and Green Divisions continued to be included in the organizational structure after another reorganization in 2000. Dayton Ordinance No. 29844-00. Throughout these reorganizations, the city ordinances made clear that the Chief, Deputy Chief, and the heads of the Divisions "shall serve at the pleasure of the City Manager." The elevation of the Division of Police to department status, as well as each of the reorganizations of the Police Department, were permissible under Section 52 of the Dayton City Charter.
 {¶ 33} In May 1999, Temple was appointed "head of the Green Zone." According to the record, Temple remained the head of the Community Policing Field Services Green Division of the Department of Police until the end of her employment with the City of Dayton. As the head of the Community Policing Field Services Green Division, Temple was the "head of a division of a department," within the meaning of Section 95(1)(C) of the Dayton City Charter. Accordingly, the trial court properly concluded that Temple was an unclassified employee of the City of Dayton.
 {¶ 34} Temple claims that the position of Major is amenable to competitive testing and, thus, can be a classified position. In support of that assertion, Temple has presented the affidavit of Sandra D. Huggins, Secretary — Chief Examiner for the City of Dayton Civil Service Board. Huggins avered that she had reviewed the job description for Major in the City of Dayton Police Department (which Temple has failed to attach to the affidavit), and that an applicant's fitness for the position of Major could be practically determined by competitive examination.
 {¶ 35} Taken in isolation, Huggins' affidavit might create a genuine issue of material fact as to whether the rank of Major is an unclassified employee position. However, under the facts before us, Temple's position as head of the Green Zone is dispositive of the issue of classification. Under Section 95(1)(C) of the Charter, the unclassified service includes the "heads of departments and heads of divisions of departments and members of appointive boards." The classified section includes "all positions not specifically included by this charter in the unclassified service." Temple's position — head of the Community Policing Field Services Green Division — is specifically included as an unclassified position. Thus, it is irrelevant whether that position could have been filled by competitive placement if the City of Dayton had so chosen.
 {¶ 36} Temple asserts that her position should be considered classified, because she held a fourth level management position below the Director of Public Safety, the Chief of Police and the Assistant Chief of Police. Although Temple stated in her affidavit that John Thomas was appointed the Director of Public Safety, the Department of Public Safety was discontinued in 1966 and the functions of the Director of Public Safety, at least with regard to police services, were distributed to the Police Chief. Dayton Ordinance 22320. Accordingly, there is no evidence that the Director of Public Safety remained the highest supervisory position within the Police Department. Temple has presented substantial evidence that Assistant Chief of Police Compston was her immediate supervisor while she was a Major. In light of the fact that, as a Major, Temple was the head of a division as established by City Commission, Compston's supervisory position has no import.
 {¶ 37} Finally, Temple's reliance upon Lewis v. Fairborn
(1997), 124 Ohio App.3d 292, 706 N.E.2d 24, is misplaced. InLewis, the pertinent section of the Fairborn Charter defined an unclassified employee as "Court Clerks, bailiffs and such officers and employees of the Municipal Court as it is found it [sic] impracticable to determine their fitness by competitive examination." Thus, as we recognized, the critical question in determinating whether the plaintiff (a Community Restitution Coordinator with the Fairborn Municipal Court) was a classified or unclassified employee was the practicability of determinating the fitness for her position by competitive examination. Id. at 296. Unlike the Fairborn Charter, the Dayton Charter does not differentiate between unclassified and classified employees based on whether the position is subject to competitive examination. Rather, the pertinent issue is whether the employee's position is specifically identified in Section 95(1). Dayton City Charter § 95(2) (differentiating between sub-classifications of classified employees). As stated, supra, Temple's position as the head of the Community Policing Field Services Green Division falls squarely within Section 95(1).
 {¶ 38} Temple's third assignment of error is overruled.
 {¶ 39} "IV. The trial court erred by finding that plaintiff-appellant barbara temple was not entitled to a hearing upon her discharge."
 {¶ 40} In her fourth assignment of error, Temple asserts that the trial court incorrectly concluded that she was not entitled to a hearing. The trial court had ruled that Temple had no right to a pre-termination hearing, reasoning:
 {¶ 41} "It has been well established in Ohio Courts that unclassified employees hold their positions at the pleasure of the appointing individual and are not afforded the protection of a hearing before being discharged. Christophel v. Kukulinsky
(6th Cir. 1995), 61 F.3d 479, 482, 485. As will be established infra, Temple is an unclassified employee. Therefore she is not guaranteed a hearing before termination. If Temple did have a right to a hearing as an unclassified employee this would be an exception to the general employment at will doctrine. Exceptions to the employment at will doctrine must be uniform and have statewide application. Greenwood v. Taft, Stettinius andHollister (1995), 105 Ohio App. 3d 295[, 663 N.E.2d 1030]. Such exceptions cannot be fragmentary. Id. Therefore a single section of a municipal charter cannot operate to serve as an exception to the employment at will doctrine. Id. Plaintiff argues that, under Section 100 of the Dayton City Charter, all employees, classified and unclassified, are entitled to a hearing before termination. If this were enforced it would be an exception to the employment at will doctrine. As stated above, exceptions to the employment at will doctrine must be uniformly applied statewide. The enforcement that Plaintiff is arguing for stems from a city charter and as such is not statewide. Therefore there can be no such exception to the employment at will doctrine and there has been no violation of the City of Dayton Charter."
 {¶ 42} On appeal, Temple asserts that Section 100 is valid and binding on the City of Dayton for all employees — classified and unclassified. She argues that the City failed to follow proper procedures by not providing her a written explanation of the reasons for her discharge or an opportunity to be heard regarding her discharge. Temple claims that these failures render her termination void. Temple also asserts that the trial court misinterpreted Greenwood in reaching its conclusions.
 {¶ 43} It is well-established that unclassified employees are not entitled to the same procedural safeguards as classified employees. "An unclassified employee is an employee at will and thus can be terminated for any non-discriminatory reason or for no reason at all. An unclassified employee is appointed at the discretion of the appointing authority and serves at the pleasure of the appointing authority. Employees in unclassified service hold their positions at the pleasure of the appointing authority, may be dismissed from their employment without cause, and are afforded none of the procedural safeguards available to those in classified service." Snyder v. City of Fairborn, Greene App. No. 2001 CA 107, 2002-Ohio-3569.
 {¶ 44} In our judgment, the Dayton City Charter does not depart from these general principles. Section 100 of the Dayton City Charter, which Temple discusses in detail, provides:
 {¶ 45} "An employe [sic] shall not be discharged or reduced in rank or compensation until he has been presented with reasons for such discharge or reduction, specifically stated in writing, and has been given an opportunity to be heard in his own defense. The reason for such discharge or reduction and any reply in writing thereto by such employe [sic] shall be filed with the Board."
 {¶ 46} Although this section appears to apply to all civil servants — classified and unclassified, this provision cannot be read in isolation. Section 48 of the Charter provides that the City Manager has the power and duty:
 {¶ 47} "(B) To appoint and, except as herein provided, remove all directors of the departments and all subordinate officers and employes [sic] in the departments in both the classified and unclassified service; all appointments to be upon merit and fitness alone, and in the classified service all appointments and removals to be subject to the civil service provisions of this Charter."
 {¶ 48} Reading the Charter as a whole, Section 100 does not apply to unclassified employees, such as Temple. Although we have not expressly addressed Section 100, we have previously concluded that, "as to those in the unclassified service, there is no condition upon removal." Johnson v. City of Dayton (Oct. 7, 1981), Montgomery App. No. 7184 (addressing Section 48(B)). Rather, unclassified employees "can be summarily discharged by the City Manager, and the preferment of charges is unnecessary." Id. As stated in Sommer v. City of Dayton (S.D. Ohio 1982),556 F. Supp. 427, "[a] contrary interpretation would, of course, conflict with the general understanding under Ohio law concerning the status of unclassified employees, to wit: that they can be removed summarily and without preferment of charges. More importantly, a contrary interpretation of § 100 would conflict with the meaning of § 48(b) of the charter." Id. at 431. We agree with this reasoning. Accordingly, we conclude that Temple, an unclassified employee, was not entitled to a hearing under the Dayton City Charter. In light of our reasoning, we need not address the trial court's reliance upon Greenwood and any error by the trial court in this regard is harmless.
 {¶ 49} The fourth assignment of error is overruled.
 {¶ 50} "V. The trial court erred by finding that the findings of fact of the U.S.E.E.O.C. did not have a preclusive effect in the case at bar."
 {¶ 51} In her fifth assignment of error, Temple claims that the trial court erred in overruling her request to give preclusive effect to the findings of the Equal Employment Opportunity Commission ("EEOC"). Because the trial court did not expressly rule upon Temple's request, we presume that it has been overruled. Pentaflex, Inc. v. Express Servs., Inc. (1998),130 Ohio App.3d 209, 217, 719 N.E.2d 1016.
 {¶ 52} On March 19, 2003, the EEOC issued a determination on the merits of Temple's charge, finding that Temple had been denied equal wages and was subsequently discharged because of her sex and in retaliation for her complaining about an unlawful employment action. Temple argues that the decision of the EEOC was a quasi-judicial determination, which the trial court was obligated to follow, absent an appeal of that decision by the City.
 {¶ 53} Temple's assertion that the EEOC determination has a preclusive effect conflicts with the Title VII enforcement scheme established by Congress. The Sixth Circuit Court of Appeals has succinctly described that scheme as follows:
 {¶ 54} "Under Title VII, once an individual files a charge alleging unlawful employment practices, the EEOC must investigate the charge and determine whether there is `reasonable cause' to believe that it is true. See 42 U.S.C. §§ 2000e-5(b) (1998). By filing a charge, an individual does not file a complaint seeking relief, but merely informs the EEOC of possible discrimination.See EEOC v. Shell Oil Co. (1984), 466 U.S. 54, 68,104 S.Ct. 1621, 80 L.Ed.2d 41. If the EEOC finds reasonable cause to believe discrimination occurred, it must `endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion.' Id. If the EEOC cannot secure an acceptable conciliation agreement from the employer, it `may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge.' 42 U.S.C. §§ 2000e-5(f) (1998). If the court agrees with the EEOC that the defendant-employer has intentionally engaged in unlawful discrimination, the court may order injunctive relief and such remedies as the reinstatement or hiring of employees, back pay, and compensatory and punitive damages. See 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1) (1998).
 {¶ 55} "While allowing the EEOC to bring suit against employers in federal court, Title VII retains a private cause of action — apart from any action the statute entitles the EEOC to bring — for the individual victim of employment discrimination. Where the EEOC investigates a charge and, after 180 days, either concludes that there is no `reasonable cause' to believe it is true or fails to make a finding of `reasonable cause,' the EEOC must notify the aggrieved individual. See42 U.S.C. §§ 2000e-5(f)(1) (1998). If the EEOC finds `reasonable cause' to believe an employer has violated Title VII but chooses not to bring suit on behalf of the federal government, the EEOC will issue a `notice of right to sue' on the charge to the aggrieved party. See 29 C.F.R. §§ 1601.28(b) (1998). Or, if after 180 days the EEOC fails to make a `reasonable cause' finding, the aggrieved individual may request a `right to sue' letter from the EEOC. See id. An individual may not file suit under Title VII if she does not possess a `right to sue' letter from the EEOC.See Rivers v. Barberton Bd. of Educ., 143 F.3d 1029, 1032 (6th Cir. 1998)." E.E.O.C. v. Frank's Nursery Crafts, Inc. (C.A.6 1999), 177 F.3d 448, 455-56.
 {¶ 56} As the statutory scheme makes apparent, a determination by the EEOC that a violation has or has not occurred is merely a precursor to further conciliation efforts or enforcement litigation. The EEOC has not been granted authority to conduct its own hearings and to issue "cease and desist" orders. See id. at 457 (discussing the legislative history of the EEOC's enforcement powers). Based on the statutory mechanism for resolving employment discrimination complaints by the EEOC, we find no basis to conclude that the EEOC acts in a quasi-judicial capacity when it renders an agency determination.
 {¶ 57} In support of her assertion that an EEOC determination may have res judicata effect, Temple relies upon Thomas v.Rectenwald (Feb. 10, 1989), Ottawa App. No. OT-88-22. In that case, Thomas had filed a charge of race discrimination with the EEOC based on his failure to obtain employment with the Port Clinton Junior High School. The EEOC determined that there was no reasonable cause to find that the allegations were true, and it presumably issued a right to sue letter. Thomas failed to file suit within ninety days, the time limitation for filing his race discrimination action. 42 U.S.C. § 2000e-5(f)(1); Truitt v. Cty.of Wayne (C.A.6 1998), 148 F.3d 644, 646 (Title VII); Lewis v.Fairview Hosp., 156 Ohio App.3d 387, 2004-Ohio-1108, ¶ 5,806 N.E.2d 185. Subsequently, Thomas brought an action for race discrimination, pursuant to 42 U.S.C. § 1981 and § 1983, based on Rectenwald's failure to hire him. On appeal, the Sixth District held that the action was precluded by Thomas's prior failure to bring a timely action under Title VII.
 {¶ 58} Although the Thomas court ostensibly relied upon res judicata, the crux of the decision was that the plaintiff could not resurrect his untimely Title VII claim by means of an action under 42 U.S.C. § 1981 and § 1983. The case before us is procedurally and factually distinguishable from Thomas, and we find Thomas to be inapposite. Certainly, the police department has no obligation to bring an enforcement action against itself, and without an enforcement action by the EEOC or Temple, the "reasonable cause" finding has no import.
 {¶ 59} We note that, even when enforcement actions are brought by the complainant, courts have excluded EEOC letters of violation from being admitted into evidence. An EEOC "reasonable cause" determination is presumptively inadmissible "because it `suggests that preliminarily there is reason to believe that a violation has taken place' and therefore results in unfair prejudice to defendant." Williams v. The Nashville Network
(C.A.6 1997), 132 F.3d 1123, 1129 (quoting EEOC v. ManvilleSales Corp. (C.A.5 1994), 27 F.3d 1089, 1095; Sherman v.Chrysler Corp. (C.A.6 Sept. 16, 2002), Case No. 00-2287. Accordingly, the trial court properly overruled Temple's request to give preclusive effect to the EEOC's findings.
 {¶ 60} The fifth assignment of error is overruled.
 {¶ 61} "II. The trial court erred by granting summary judgment to defendants-appellees and failing to grant summary judgment to plaintiffs-appellants."
 {¶ 62} In her second assignment of error, Temple asserts that the trial court should have granted her motion for summary judgment and denied the City's motions. She claims that she was a classified employee and that she was entitled to hearing upon her discharge. She further claims that McManus was estopped from discharging her, that McManus engaged in negligent misrepresentation and fraud, that her discharge was contrary to public policy, and that her discharge was discriminatory.
 {¶ 63} First, Temple asserts that she was an unclassified employee and that Section 100 granted her an opportunity to be heard. As we discussed supra, Temple was an unclassified employee who was not entitled to a hearing. Therefore, Temple's argument lacks merit.
 {¶ 64} Second, Temple claims that she had established a claim of promissory estoppel. She states that, during his interview with the Dayton Police Command Staff prior to his selection as Chief, McManus stated that "he was not coming in to `whack' anyone, that as long as everyone did their job, they were ok." The City responds that McManus's statements cannot form a basis for a promissory estoppel claim, because he had no authority to act at the time the statements were made. The City further argues that the statements were not a clear promise of employment for any term or tenure, and that Temple has not demonstrated that she relied upon the statement to her detriment.
 {¶ 65} As recognized by the City, promissory estoppel is an exception to the doctrine of employment at will. Mers v.Dispatch Printing Co. (1985), 19 Ohio St.3d 100, 483 N.E.2d 150
(recognizing two exceptions to the doctrine: implied contract and promissory estoppel). To establish a claim of promissory estoppel, a plaintiff must prove: "(1) a clear, unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance is injured as a result of reliance on the promise." Weiper v. W.A. Hill Assoc. (1995),104 Ohio App.3d 250, 260, 661 N.E.2d 796, citing Healey v.Republic Powdered Metals, Inc. (1992), 85 Ohio App.3d 281,284-285, 619 N.E.2d 1035; Shepard v. Griffin Servs., Inc.,
Montgomery App. No. 19032, 2002-Ohio-2283. Thus, "[t]he test in such cases is whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee." Mers, supra, at paragraph three of the syllabus. "Standing alone, praise with respect to job performance and discussion of future career development will not modify the employment-at-will relationship."Helmick v. Cincinnati Word Processing, Inc. (1989),45 Ohio St.3d 131, 543 N.E.2d 1212, at paragraph three of the syllabus.
 {¶ 66} In the present case, no clear promise of continued employment was made. McManus's comment that he did not intend to terminate anyone's employment was a general comment made to the entire Command Staff about his intentions. Despite her subjective understanding that her employment would continue, there was no specific promise of continued employment to Temple by McManus. See Weiper, 104 Ohio App.3d at 255 (statement that employee was "doing a good job" and could "mak[e] a lot of money for [the] company for a long time to come" was not a specific promise of continued employment); Daup v. Tower Cellular, Inc. (2000),136 Ohio App.3d 555, 737 N.E.2d 128. Certainly, McManus's statement cannot reasonably be construed as a promise that she would have a job regardless of her job performance. In addition, we agree with the trial court that it was unlikely that McManus could have reasonably expected that his statement would have been perceived as an express promise of continued employment to all of the individuals at that meeting. Moreover, Temple has not cited evidence that she had reasonably relied upon McManus's statement. Although Temple asserts that she relied upon the alleged promise when she did not begin to search for other employment, Temple does not cite to any evidence that she had intended to or had begun to seek other employment opportunities due to the fact that she had previously been informed that the new chief would be able to "pick his own team." Accordingly, construing the evidence in the light most favorable to Temple, she has not established a claim of promissory estoppel.
 {¶ 67} Third, the trial court properly granted summary judgment to the City on Temple's claim that McManus engaged in negligent misrepresentation and fraud. As with her promissory estoppel claim, Temple's claims of negligent misrepresentation and fraud are based on McManus's statement that he did not intend to dismiss any of the Command Staff as long as they did their jobs satisfactorily.
 {¶ 68} The supreme court has recognized a claim of negligent misrepresentation, stating: "One who, in the course of his business, profession or employment * * * supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Emphasis sic.) Delman v.City of Cleveland Hts. (1989), 41 Ohio St.3d 1, 4,534 N.E.2d 835, quoting 3 Restatement of the Law 2d, Torts (1965) 126-127, Section 552(1).
 {¶ 69} Common-law fraud requires proof of the following elements: "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance."State ex rel. The Illuminating Co. v. Cuyahoga Cty. Court ofCommon Pleas, 97 Ohio St.3d 69, 74, 2002-Ohio-5312,776 N.E.2d 92, quoting Russ v. TRW, Inc. (1991), 59 Ohio St.3d 42, 49,570 N.E.2d 1076.
 {¶ 70} We find no basis to conclude that McManus's statement was made falsely and with the intent of misleading Temple and the other members of the Command Staff into relying upon it. The fact that McManus ultimately chose to terminate Temple's employment does not, by itself, establish that he had made a false statement regarding his intentions to retain employees if they performed their jobs satisfactorily. In addition, as stated supra, we find no evidence that Temple, in fact, forewent searching for new employment as a result of McManus's statement. Nor do we find Temple's alleged reliance to be justifiable; Temple was informed that McManus could select his own team, she was encouraged to consider other employment opportunities, and McManus's statement was not reasonably construed as a specific promise of employment for a definite period of time. Accordingly, the trial court did not err in granting the City's motion for summary judgment on Temple's fraud and negligent misrepresentation claims.
 {¶ 71} Fourth, the trial court properly ruled that Temple was not discharged in violation of public policy. The Supreme Court of Ohio first recognized a cause of action for wrongful discharge in violation of public policy in Greeley v. Miami ValleyMaintenance Contrs., Inc. (1990), 49 Ohio St.3d 228,551 N.E.2d 981. The elements of a claim of wrongful discharge in violation of public policy are now well-established:
 {¶ 72} "1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity
element).
 {¶ 73} "2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
 {¶ 74} "3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
 {¶ 75} "4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification
element)."
 {¶ 76} Collins v. Rizkana, 73 Ohio St.3d 65, 69-70,1995-Ohio-135, 652 N.E.2d 653; Hundley v. Dayton Power LightCo., 148 Ohio App.3d 556, 2002-Ohio-3566, 774 N.E.2d 330. The first two elements, the clarity and jeopardy elements, "`both of which involve relatively pure law and policy questions,' are questions of law to be determined by the court." Collins,73 Ohio St.3d at 70. The third and fourth elements are questions of fact to be determined by the jury. See id.
 {¶ 77} Temple argues that Article XV, Section 10 of the Ohio Constitution sets forth a public policy in favor of retaining qualified, experienced personnel in the civil service and of discharging only those lacking in merit or fitness. Temple asserts that this public policy is also illustrated by R.C.124.322, which concerns the layoff of public employees, and in opinions of the Supreme Court of Ohio, such as Jackson v.Coffey (1977), 52 Ohio St.2d 43, 46, 368 N.E.2d 1259, andNeffner v. Hummel (1943), 142 Ohio St. 324, 329, 51 N.E.2d 900.
 {¶ 78} We agree with Temple that Article XV, Section 10 of the Ohio Constitution and other civil service laws set forth a public policy in favor of hiring and promoting in the civil service based on merit and fitness. However, as discussed supra, unclassified employees are employees-at-will who do not enjoy the same procedural protections as classified employees. Accordingly, the public policies established primarily for the benefit of classified employees cannot form the basis for an unclassified employee's claim of wrongful discharge in violation of public policy. The trial court properly granted summary judgment to the City on Temple's wrongful discharge in violation of public policy claim.
 {¶ 79} Finally, Temple claims that the trial court erred in finding that she had not demonstrated a prima facie case of age, race, sex or political discrimination. The trial court found as follows:
 {¶ 80} "* * * In regards to age, race and gender[,] Temple cannot show that she was a member of a protected class and that her termination allowed for the hiring of or retention of someone not in the protected class. Temple is over the age of forty. The individuals that assumed positions similar to her previously held position are also over the age of forty. Temple is a white female. Individuals retained by McManus include both white and female individuals, members of the same class as Temple. In regards to the claimed `political discrimination' Ohio courts do not recognize such a claim. Bauer v. Montgomery (C.A.6 2000),215 F.3d 656, 659."
 {¶ 81} We agree with the trial court that Temple has not presented a claim of political discrimination. Assuming arguendo that such a cause of action exists for an unclassified employee, see Bisbee v. Cuyahoga Cty. Bd. of Elections (Mar. 1, 2001), Cuyahoga App. No. 77629, Temple has presented no evidence that her discharge was based on her political affiliation. McManus's alleged statement that she was fired because she was not "part of the team" is ambiguous, at best, and does not by itself suggest that Temple's political beliefs or affiliation were a basis for her termination.
 {¶ 82} Turning to her discrimination claims based on sex, race, and age, R.C. 4112.02 provides that it is an unlawful discriminatory practice:
 {¶ 83} "(A) For any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."
 {¶ 84} R.C. 4112.14(A), which prohibits age discrimination in employment, provides: "No employer shall discriminate in any job opening against any applicant or discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee."
 {¶ 85} A claim of discrimination may be proven by either direct or circumstantial evidence. Byrnes v. LCI CommunicationHoldings Co., 77 Ohio St.3d 125, 128, 1996-Ohio-307,672 N.E.2d 145. To establish a discrimination claim based upon circumstantial evidence, a plaintiff must initially demonstrate a prima facie case of discrimination. Id. at 128, citing Barker v.Scovill, Inc. (1983), 6 Ohio St.3d 146, 451 N.E.2d 807 (adopting the guidelines set forth in McDonnell Douglas Corp. v. Green
(1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668); Coryell v.Bank One Trust Co. N.A., 101 Ohio St.3d 175, 2004-Ohio-723,803 N.E.2d 781. Once this prima facie case is established, an inference of discrimination arises. The burden then shifts to the employer to show that it had a legitimate, nondiscriminatory reason for its action. See Kohmescher v. Kroger Co. (1991),61 Ohio St.3d 501, 503, 575 N.E.2d 439. If the employer articulates such a reason, the employee must show that the articulated reason was merely a pretext for discrimination. See id. at 503-04. The burden of persuasion, however, always remains with the plaintiff.St. Mary's Honor Ctr. v. Hicks (1993), 509 U.S. 502, 511,113 S.Ct. 2742, 125 L.Ed.2d 407. In evaluating discrimination claims, it is appropriate to look to analogous federal anti-discrimination statutes. See Plumbers Steamfitters JointApprenticeship Commt. v. Ohio Civil Rights Comm. (1981),66 Ohio St. 2d 192, 421 N.E.2d 129; Wooten v. Columbus, Div. of Water
(1993), 91 Ohio App. 3d 326, 334, 632 N.E.2d 605.
 {¶ 86} Beginning with Temple's age discrimination claim, Temple may establish a prima facie case of discrimination by showing that she: (1) was a member of the statutorily protected class, (2) was discharged, (3) was qualified for the position, and (4) was replaced by, or the discharge permitted the retention of, a person of substantially younger age. Coryell,101 Ohio St.3d at 180. Thus, a plaintiff may establish a prima facie case even if she was replaced by an individual who was forty or more years of age, as long as that individual is "substantially younger." Id. The supreme court has elected not to establish a bright-line rule defining the requisite age differential. Id. at 181. "The term `substantially younger' as applied to age discrimination in employment cases defies an absolute definition and is best determined after considering the particular circumstances of each case." Id.
 {¶ 87} At the time of her termination, Temple was fifty-one years old. After Temple's termination, the Green and Blue Zone Divisions were combined into one Parol Operations Division. Major Kenton Rainey, who was appointed to head the new division, was forty-three years old at the time he was hired. Although Temple asserts that she was replaced by Rainey, it is undisputed that Rainey was responsible for Temple's previous duties plus those of the head of the Blue Division. See Barnes v. GenCorp. Inc.
(C.A.6 1990), 896 F.2d 1457, 1465 ("[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work."). Thus, she was not "replaced" by Rainey.
 {¶ 88} In addition to hiring Rainey, McManus hired Julian Davis and promoted Bruce Burt and Mark Ecton to the position of Major. These individuals were one, two and nine years younger than Temple, respectively. Majors Wanda Smith and Mark Stusek were also retained; their ages are not in the record. In light of the fact that Davis and Burt were similar in age to Temple, Temple has not raised an inference that her discharge was due to her age. Accordingly, the trial court did not err in finding that Temple had not presented a prima facie case of age discrimination.
 {¶ 89} Temple also claims that she was discharged due to her sex and race, in violation of R.C. 4112.02. With regard to her sex discrimination claim, Temple relies primarily upon the EEOC determination that "[e]vidence obtained during the investigation reveals the Charging Party (Plaintiff Temple) was denied equal wages and subsequently discharged because of her sex * * *." We reject Temple's contention that the determination of the EEOC "provides clear evidence that Temple's dismissal from the Dayton Police was discriminatory." As stated supra, a determination by the EEOC that a violation may have occurred is not binding on the court, and the EEOC's finding is subject to a motion in limine due to its prejudicial nature to the employer. Moreover, the EEOC determination may have been based upon evidence that is not part of the record before us. Accordingly, like the trial court, we will not consider the EEOC determination in reviewing the motions for summary judgment.
 {¶ 90} Upon review of the record, we conclude that Temple has presented a prima facie case of sex and race discrimination. Although McManus did not terminate Smith (a white female) as part of his reorganization of the command staff, he discharged Temple and hired three African-American males to fill Major positions. In addition, he internally promoted two males, Burt and Ecton. In our judgment, such conduct raises an inference that Temple was discharged based on her sex and race. The City also asserts that Compston was asked to retire, thus demonstrating that Temple was treated similarly to a male. However, the City has not cited to any evidence in the record (and we have found none) to support the assertion that Compston was asked to retire. Accordingly, the trial court should not have granted summary judgment on the ground that no prima facie case of sex or race discrimination had been shown.
 {¶ 91} In addition, Temple asserts that she has demonstrated a prima face case of sex discrimination based on unequal wages, pursuant to R.C. 4111.17. Although not clearly articulated, this claim apparently relates to her January 10, 2002, management complaint, in which she complained that her peers "are about $10,000 ahead of me in salary and my direct reports are at about the same earning level instead of allowing the minimum 4% difference between what they earn and what [Temple] earn[ed]." The City responds that Temple is not an employee, within the meaning of R.C. 4111.01, because she was employed by the police department in a "bona fide executive, administrative, or professional capacity." Focusing on the individuals hired by McManus, the City further argues that the pay differential was due to "factors other than sex" and for incomparable positions.
 {¶ 92} We agree with the City that Temple was not an employee within the meaning of R.C. 4111.17, albeit for different reasons. R.C. 4111.01(D)(7) specifically exempts "[a] member of a police or fire protection agency" from the definition of an "employee." See State Fraternal Order of Police, Grand Lodge No. 1 v. State
(1983), 4 Ohio St.3d 28, 34, 446 N.E.2d 157 (state highway patrolmen were not employees under R.C. 4111.01(D)(7)); Waltmirev. Washington Tsp. (2001), 116 Ohio Misc.2d 30, 764 N.E.2d 520;In re Fraternal Order of Police, Ohio Valley Lodge 112 (1990),61 Ohio Misc.2d 135, 575 N.E.2d 535 (sheriff's deputies are not "employees" under R.C. Chapter 4111). Accordingly, the trial court properly granted summary judgment on Temple's R.C. 4111.17
claim.
 {¶ 93} The trial court did not address Temple's retaliation claim nor whether Temple had demonstrated that the City's proffered legitimate, nondiscriminatory reason for Temple's discharge was pretextual. Although the parties have briefed these issues, we decline to address them in the first instance.
 {¶ 94} The second assignment of error is sustained in part and overruled in part.
 {¶ 95} In summary, Temple's first, third, fourth and fifth assignments of error are overruled. Her second assignment of error is overruled as to her claims of promissory estoppel, fraud and negligent misrepresentation, discharge in violation of public policy, political discrimination, wage discrimination and age discrimination. Her second assignment of error is sustained as to her claims of sex discrimination, race discrimination, and retaliation.
 {¶ 96} The judgment of the trial court will be affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
Fain, P.J. and Grady, J., concur.
[1] Specifically, the plaintiffs in this case are Temple and her two daughters, Elizabeth and Jennifer. They brought suit in their individual capacities as well as "on behalf of themselves as taxpayers and citizens of the City of Dayton." Temple also sued as a relator. The defendants in this action, as alleged in the complaint, are: (1) the City of Dayton; (2) J. Rita McNeil, Law Director; (3) John Danish, Acting Director of Law; (4) Rhine McLin, Mayor; (5) John Thomas, Safety Director; (6) William McManus, Chief of Police; (7) City Commissioners Joey Lewis, Richard Zimmer, Idotha "Bootsie" Neal, and Dean Lovelace; and (8) Julian Davis, Mark Ecton, Kenton Rainey, and Bruce Burt, who are Majors in the Police Department.
[2] On August 27, 2003, Temple filed her Reply Memorandum Contra to Defendants' Motion for Partial Summary Judgment as to Plaintiffs' Claims, and Plaintiffs' Additional Authority and Fact Entitling Plaintiffs to Summary Judgment. However, Temple had already filed a memorandum opposing the City's motion for partial summary judgment. Thus, the summary judgment motions were fully briefed at the time that Temple filed her notices.